971 A.2d 989

RAYMOND ARTHUR ABBOTT, A MINOR, BY HIS GUARDIAN AD LITEM, FRANCES ABBOTT; ARLENE FIGUEROA, FRANCES FIGUEROA, HECTOR FIGUEROA, ORLANDO FIGUEROA AND VIVIAN FIGUEROA, MINORS, BY THEIR GUARDIAN AD LITEM, BLANCA FIGUEROA; MICHAEL HADLEY, A MINOR, BY HIS GUARDIAN AD LITEM, LOLA MOORE; HENRY STEVENS, JR., A MINOR, BY HIS GUARDIAN AD LITEM, HENRY STEVENS, SR.; CAROLINE JAMES AND JERMAINE JAMES, MINORS, BY THEIR GUARDIAN AD LITEM, MATTIE JAMES; DORIAN WAITERS AND KHUDAYJA WAITERS, MINORS, BY THEIR GUARDIAN AD LITEM, LYNN WAITERS; CHRISTINA KNOWLES, DANIEL KNOWLES AND GUY KNOWLES, JR., MINORS, BY THEIR GUARDIAN AD LITEM, GUY KNOWLES, SR.; LIANA DIAZ, A MINOR, BY HER GUARDIAN AD LITEM, LUCILA DIAZ; AISHA HARGROVE AND ZAKIA HARGROVE, MINORS, BY THEIR GUARDIAN AD LITEM, PATRICIA WATSON; AND LAMAR STEPHENS AND LESLIE STEPHENS, MINORS, BY THEIR GUARDIAN AD LITEM, EDDIE STEPHENS, PLAINTIFFS–RESPONDENTS AND CROSS–MOVANTS, v. FRED G. BURKE, COMMISSIONER OF EDUCATION; EDWARD G. HOFGESANG, NEW JERSEY DIRECTOR OF BUDGET AND ACCOUNTING; CLIFFORD A. GOLDMAN, NEW JERSEY STATE TREASURER; AND NEW JERSEY STATE BOARD OF EDUCATION, DEFENDANTS–MOVANTS AND CROSS–RESPONDENTS.

Argued September 22, 2008—Remanded November 18, 2008—Master's Report filed March 26, 2009—Re-argued April 28, 2009—Decided May 28, 2009.

*Anne Milgram,* Attorney General of New Jersey, argued the cause for movants and cross-respondents (*Ms. Milgram,* attorney; *Robert J. Gilson,* Director, Division of Law, Assistant Attorney General and *Nancy Kaplen,* Assistant Attorney General, of counsel; *Ms. Milgram* and *Kevin R. Jespersen,* Deputy Attorney General, on the briefs).

*David G. Sciarra,* Executive Director, Education Law Center, argued the cause for respondents and cross-movants (*Mr. Sciarra and Gibbons,* attorneys; *Mr. Sciarra, Elizabeth A. Athos, Theresa Luhm, Ellen M. Boylan, Avidan Y. Cover, and Deborah G. Splansky,* on the briefs).

Justice LaVECCHIA delivered the opinion of the Court.

One of the fundamental responsibilities of the State is to provide a public education for its children. The New Jersey Constitution requires that

[t]he Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years.

[*N.J. Const.* art. VIII, § 4, ¶ 1.]

That the education of youth is essential to the workings of democracy and the future well-being of society is widely appreciated. As Chief Justice Earl Warren pronounced in the historic decision, *Brown v. Board of Education,*

[t]oday, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

[347 *U.S.* 483, 493, 74 *S.Ct.* 686, 691, 98 *L.Ed.* 873, 880 (1954).]

That was 1954. Today we are almost a decade into the twenty-first century, and nearly twenty years have passed since this Court found that the State's system of support for public education was inadequate as applied to pupils in poorer urban districts. *Abbott v. Burke,* 119 *N.J.* 287, 295, 575 *A.*2d 359 (1990) (*Abbott II*). Finding that more severely disadvantaged pupils require more resources for their education, the Court held that the State must develop a funding formula that would provide all children, including disadvantaged children in poorer urban districts, with an equal educational opportunity as measured by the Constitution's thorough and efficient clause. *Id.* at 374, 384–86, 575 *A.*2d 359. A later decision added that the funding needed to be coupled to a set of educational program standards. *Abbott v. Burke,* 136 *N.J.* 444, 643 *A.*2d 575 (1994) (*Abbott III* ).

Today's decision marks the twentieth opinion or order issued in the course of the Abbott litigation. In the interim, much has changed. There have been significant demographic changes among school districts in terms of the distribution of at-risk pupils

and changes in the level of State-provided education funding. The State now maintains that it has heeded our call to create a funding formula based on curriculum content standards and to demonstrate that the formula addresses the needs of disadvantaged students everywhere, thereby achieving constitutional compliance. Therefore, once again we assess the constitutionality of a State school funding system.

## I.

This matter is before us on the State's Motion for Review of the Constitutionality of the School Funding Reform Act of 2008 (SFRA), *L.* 2007 *c.* 260 (*N.J.S.A.* 18A:7F–43 to –63). The State's motion seeks a declaration that SFRA's funding formula satisfies the requirements of the thorough and efficient education clause of the New Jersey Constitution and that, therefore, the State is released from the Court's prior remedial orders concerning education funding for students in Abbott districts. Specifically, the State asks for elimination of the requirements that Abbott districts be provided parity aid and supplemental funding.

The State's motion was opposed by plaintiffs with the support of various amici curiae. Plaintiffs filed a cross-motion seeking to maintain the status quo. We found that the dispute over the formula's constitutionality was not conducive to resolution on a summary record and, therefore, we remanded the matter to a special master for development of an evidential record. *Abbott v. Burke,* 196 *N.J.* 544, 565, 960 *A.*2d 360 (2008) (*Abbott XIX*). The remand allowed for the presentation of State witnesses to explain what went into the creation of this formula and how it would work. In the proceedings before the Special Master, the State's fact and expert witnesses were challenged through cross-examination and through witnesses presented by plaintiffs. The Special Master's Report provided this Court with a summary of his fact-finding, accompanied by reasons for crediting or discounting the testimony

of the witnesses. *See Appendix* at 176–250, 971 *A.*2d at 1010–54. The Report has proven invaluable.[1]

■ We have reviewed the record, the Special Master's findings and recommendations, and the arguments of the parties.[2] We conclude that SFRA is constitutional, to the extent that this record permitted its review. We therefore hold that SFRA's funding formula may be applied in Abbott districts, with the following caveats. Our finding of constitutionality is premised on the expectation that the State will continue to provide school funding aid during this and the next two years at the levels required by SFRA's formula each year. Our holding further depends on the mandated review of the formula's weights and other operative parts after three years of implementation. *See N.J.S.A.* 18A:7F–46(a), (b), –51(a), –55(f), –57(a), –59.

Our approval of SFRA under the State Constitution relies, as it must, on the information currently available. But a state funding formula's constitutionality is not an occurrence at a moment in time; it is a continuing obligation. Today's holding issues in the good faith anticipation of a continued commitment by the Legislature and Executive to address whatever adjustments are necessary to keep SFRA operating at its optimal level. The three year look-back, and the State's adjustments based on that review, will provide more information about the efficacy of this funding formula. There should be no doubt that we would require remediation of any deficiencies of a constitutional dimension, if such problems do emerge.

---

[1] We thank the Honorable Peter E. Doyne, A.J.S.C., for serving as our Special Master.

[2] In reviewing the report of a Special Master, we "employ our ordinary standards of review, considering them in the same manner as we would the findings and conclusions of a judge sitting as a finder of fact." *State v. Chun,* 194 *N.J.* 54, 93, 943 *A.*2d 114 (2008). We "accept the fact findings to the extent that they are supported by substantial credible evidence in the record." *Ibid.* Legal conclusions, on the other hand, are owed "no particular deference." *Ibid.* We have applied those standards in our analysis of this matter.

With that understanding, SFRA may be implemented as it was designed, as a state-wide unitary system of education funding. The State shall not be required to continue separate funding streams mandated under past remedial orders. During the two-year period until the look-back review occurs, we cannot ignore, as a practical matter, the substantial amount of additional funds that will be available from non-SFRA sources for pupils in Abbott districts. The availability of those funds further cushions the transition to SFRA's funding scheme. In sum, although no prediction is without some uncertainty, the record before us convincingly demonstrates that SFRA is designed to provide school districts in this state, including the Abbott school districts, with adequate resources to provide the necessary educational programs consistent with state standards.

## II.

Enacted by the Legislature and signed into law by the Governor in January 2008, SFRA is the product of the State's most recent, lengthy and painstaking effort to craft a redesigned school funding formula that satisfies the constitutional standard. SFRA's place in history dictates the nature of our review of its constitutionality.

Had this statute been enacted earlier in the history of school funding litigation, when the State first was required to devise a new formula to provide sufficient state support to assure that all school districts could meet the constitutional obligation,[3] we would be approaching our task by attaching the familiar presumption of constitutionality. *See N.J. Sports & Exposition Auth. v. McCrane*, 61 *N.J.* 1, 8, 292 *A.*2d 545 (stating that "every possible presumption favors the validity of an act of the Legislature"), *appeal dismissed sub nom, Borough of E. Rutherford v.*

---

[3] For example, we refer to *Abbott v. Burke,* 100 *N.J.* 269, 495 *A.*2d 376 (1985) (*Abbott I*), and the earlier school funding cases of *Robinson v. Cahill,* 69 *N.J.* 133, 351 *A.*2d 713 (1975) (*Robinson IV*) and *Robinson v. Cahill,* 62 *N.J.* 473, 303 *A.*2d 273 (1973) (*Robinson I*).

*N.J. Sports & Exposition Auth.*, 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.*2d 215 (1972); *see also In re P.L. 2001*, 186 *N.J.* 368, 392, 895 *A.*2d 1128 (2006) (stating that "we will not declare void legislation unless its repugnancy to the Constitution is clear beyond a reasonable doubt" (internal citations omitted)). The presumption attaching to typical legislative enactments affects the application of burdens of proof and the weighing of the evidence. *See Bd. of Educ. of Piscataway Twp. v. Caffiero*, 86 *N.J.* 308, 318, 431 *A.*2d 799 (attaching presumption of validity to legislation requires party challenging legislation to carry burden of proving its unconstitutionality), *appeal dismissed*, 454 *U.S.* 1025, 102 *S.Ct.* 560, 70 *L.Ed.*2d 470 (1981); *see also Hamilton Amusement Ctr. v. Verniero*, 156 *N.J.* 254, 285, 716 *A.*2d 1137 (1998) (noting similarly that party may overcome presumption and carry burden by demonstrating constitutional repugnancy beyond reasonable doubt).

■ The State enacted SFRA, however, after decades of school funding litigation that have led to the issuance of numerous remedial orders to enforce the constitutional rights of the pupils in the Abbott districts. The constitutional review, therefore, cannot begin with the familiar presumption. If the State is to replace adherence to those prior remedial orders with the application of SFRA's new funding formula for children in Abbott districts, it must demonstrate that the concerns that compelled the Court to resort to judicially crafted remedies have been overcome. *See Abbott XIX, supra*, 196 *N.J.* at 566, 960 *A.*2d 360.

We recounted the relevant history of the Abbott litigation for the purposes of addressing the instant application. *Id.* at 548–49, 560–63, 960 *A.*2d 360. We therefore draw from that summary the points that remain salient. In *Abbott XIX, supra*, we noted that early in the Abbott litigation,

> plaintiffs carried their burden to overcome the presumption of validity that is accorded to legislative enactments, and successfully demonstrated the unconstitutionality of public school funding under Chapter 212 as applied to them. *See Abbott v. Burke*, 119 *N.J.* 287 [575 *A.*2d 359] (1990) (*Abbott II*). The State was ordered to provide plaintiffs attending special needs districts (later designated as "Abbott districts") with a constitutionally compliant education, *id.* at 374 [575 *A.*2d

359], supported by funding in accordance with standards established to guide the State's achievement of a constitutional system of education, *id.* at 384–86 [575 *A.*2d 359].

[196 *N.J.* at 548–49, 960 *A.*2d 360.]

*Abbott II* required the creation of a formula that would provide certainty in funding for the special needs districts. *Abbott XIX, supra,* 196 *N.J.* at 560, 960 *A.*2d 360. Despite ordering that relief, *Abbott II* recognized that " 'funding alone will not achieve the constitutional mandate' for pupils in districts having high concentrations of poor children." *Abbott XIX, supra,* 196 *N.J.* at 560, 960 *A.*2d 360 (citing *Abbott II, supra,* 119 *N.J.* at 295, 575 *A.*2d 359). Funding coupled with a set of standards to measure the required level of education to be delivered also was deemed essential to a constitutional solution. *See Abbott III, supra,* 136 *N.J.* at 451–52, 643 *A.*2d 575.

Eventually, the State enacted the Comprehensive Educational Improvement and Financing Act of 1996 (CEIFA), with its set of comprehensive core curriculum standards (CCCS) and accompanying funding formula. *Abbott XIX, supra,* 196 *N.J.* at 561, 960 *A.*2d 360. Although this Court approved the curriculum standards in *Abbott v. Burke,* 149 *N.J.* 145, 693 *A.*2d 417 (1997) (*Abbott IV*), CEIFA's fiscal standards were found lacking and were held to be insufficient for constitutional purposes as applied to pupils in the Abbott districts. *Abbott XIX, supra,* 196 *N.J.* at 562, 960 *A.*2d 360. The State's inability to devise a funding formula that measured the cost of delivering educational content standards in districts having concentrated populations of disadvantaged pupils with multiple learning challenges forced the Court to devise a judicial remedy to fill the void. As *Abbott XIX, supra,* explained:

the Court was unable to approve the fiscal standards adopted in CEIFA to support the CCCS because the standards were based on costs in a hypothetical school district that supposedly served as a model for all school districts. [*Abbott IV, supra,* 149 *N.J.* at 163, 693 *A.*2d 417.] The Court noted that the "model" did not account for the characteristics of special needs districts. *Id.* at 172 [693 *A.*2d 417]. Furthermore, the Court also found that those special needs were not adequately provided for through CEIFA's categorical aid for supplemental programs—demonstrable effective program aid (DEPA)—because DEPA funding also was not calculated based on a study of the special needs of the high concentrations of poor

students attending Abbott districts. *Id.* at 185 [693 *A.*2d 417]. Thus, the Court was forced to conclude that the State had not demonstrated an adequate basis for using the per-pupil funding amounts for supplemental programs. *Ibid.*

[196 *N.J.* at 562, 960 *A.*2d 360.]

Accordingly, "[f]aced with no viable alternative legislative or administrative solution to the funding dilemma, the Court ordered the parity remedy." *Ibid.* The parity remedy focused on the state's most affluent school districts, classified as I and J districts for regulatory purposes, because the Court found that such districts provided "an objective and reasonable indicator of resources needed to achieve the CCCS." *Ibid. Abbott XIX, supra,* noted that the parity remedy

was recognized, even at the time, as an "interim" remedy, albeit the Court's "chosen interim remedy." [*Abbott IV, supra,* 149 *N.J.* at 190, 693 *A.*2d 417.] The door was left open, however, for an alternative funding approach. The Court allowed that the Legislative and Executive Branches could devise an adequate alternative funding remedy so long as the State could show, convincingly, that a thorough and efficient education can be met through expenditures lower than parity, or if the State showed that the I and J districts' spending contained inefficiencies. *Id.* at 196 [693 *A.*2d 417].

[196 *N.J.* at 562–63, 960 *A.*2d 360.]

Thereafter, in *Abbott v. Burke,* 153 *N.J.* 480, 710 *A.*2d 450 (1998) (*Abbott V*), the Court further "settled details about the supplemental programs that would be required for pupils in special needs districts," *Abbott XIX, supra,* 196 *N.J.* at 563, 960 *A.*2d 360, and in the years since, the State has "abided by the Court-ordered parity remedy enhanced by supplemental funding to the Abbott districts." *Ibid.*

We summarized the history and context of the present litigation in the following manner:

The State's efforts to comply with its constitutional obligation have spanned decades. Plaintiffs have had to bring numerous challenges to ensure that the State satisfied its constitutional obligation. They have worked long and hard to obtain a constitutionally sound, mandated educational program that is supported by a consistent level of State funding. And, their success has enabled children in Abbott districts to show measurable educational improvement. That background brings the present application into sharp relief.

[*Id.* at 549, 960 *A.*2d 360.]

We determined that the State's request to have its new funding formula declared constitutional on the basis of an undeveloped record, supported only by affidavits, would not suffice for purposes of SFRA's replacement of the remedial orders governing education funding in Abbott districts. *Id.* at 565, 960 *A.*2d 360. We remanded for the development of a record and placed the burden of proof on the State. *Id.* at 565–66, 960 *A.*2d 360. Because the CCCS already were found to be constitutional, *see Abbott IV, supra,* 149 *N.J.* at 168, 693 *A.*2d 417, the issue on remand was whether the State had devised a funding formula that provided sufficient support for the delivery of a thorough and efficient education as defined by the CCCS, even when applied in the context of the peculiar difficulties faced by districts with concentrated levels of at-risk pupils, *Abbott XIX, supra,* 196 *N.J.* at 566, 960 *A.*2d 360. Only by meeting those concerns could SFRA replace the remedial orders governing the provision of education funding to Abbott districts. *Ibid.* We made clear in *Abbott XIX,* however, that

> [b]y that … we do not mean that the formula must produce the equivalent in an exact dollar amount to that which parity/supplemental-program funding would have provided to be constitutional.
>
> [*Id.* at 564, 960 *A.*2d 360.]

Plainly, however, we were particularly interested in having the new formula examined to understand how it supports accommodation of the special needs of disadvantaged students. *Id.* at 566, 960 *A.*2d 360. We further held that, until the Court approves a new funding program for Abbott districts, the prior remedial orders would remain in effect.[4] *Ibid.* With those stipulations, we

---

[4] We added, in connection with the State's request for immediate relief from the obligation to provide supplemental funding, that we "consider that level of funding for any individual Abbott district to be presumptively sufficient for the current year." *Abbott XIX, supra,* 196 *N.J.* at 567, 960 *A.*2d 360. That level was not less than 102 percent of the previous year's funding level. *Id.* at 566, 960 *A.*2d 360. However, we further allowed the Abbott districts to show that they were unable to provide a thorough and efficient education within those constraints by permitting them an opportunity to attempt to rebut the presumption of sufficient funding. *Id.* at 567, 960 *A.*2d 360.

remanded for expedited proceedings before an appointed special master. *Id.* at 567, 960 *A.*2d 360. This opinion picks up where the holding in *Abbott XIX* left off, focusing on SFRA, as dissected in the proceedings conducted before the Special Master.

### III.

SFRA allocates state resources to school districts, while also requiring certain levels of funding at the local level. The State's implementation of the Professional Judgment Panel (PJP) process, which led to the creation of the formula enacted by the Legislature, was discussed generally in this Court's earlier opinion, *see Abbott XIX, supra,* 196 *N.J.* at 552–55, 960 *A.*2d 360, and in the Special Master's Report, *see App.* at 190–210, 971 *A.*2d at 1018–30. Summarized below are the Special Master's findings, and relevant recommendations about how the formula works. Thereafter we consider plaintiffs' chief criticisms about SFRA's development and its deficiencies as applied to Abbott districts.

### A.

The Report describes SFRA succinctly as a weighted school funding formula. SFRA identifies a base cost associated with the education of an elementary pupil without any particular special needs. Once identified, the per-pupil amount is increased to reflect characteristics that are widely accepted as increasing the cost of education. Those characteristics are: 1) grade level, and whether the pupil is 2) an at-risk pupil (defined as one eligible for a free- or reduced-price lunch), 3) a Limited English Proficiency (LEP) pupil, or 4) a special education student of mild, moderate, or severe classification.

The State used the PJP process initially to assess the resources necessary for the base educational programs needed by an elementary student. It then costed out those resources using New Jersey data. The calculation of the additional weights also was

produced through the PJP process. That process involved the use of multiple panels of educators from across the state and experts.[5]

The process led to a formula in which the State's contribution to funding operates in several ways.

***The Adequacy Budget.*** At the core of the formula is the Adequacy Budget. The Adequacy Budget is wealth equalized, which means that it is based on the community's wealth and ability to provide funding through local resources.[6]

As described in the Special Master's Report,

[t]he Adequacy Budget is composed of four categories of aid: 1) a base aid amount for elementary, middle, and high school students, 2) additional weights for at-risk and LEP students, and vocational districts, 3) two-thirds of the census based costs for special education, and 4) all census-based costs for speech-only special education.

[*App.* at 212, 971 *A.*2d at 1031–32.]

The per-pupil amount is intended to represent the cost of educating an elementary school student, that is, of providing that student with the CCCS and extracurricular and co-curricular activities necessary for a thorough and efficient education.[7] Under SFRA, the base per-pupil amount for 2008–09 is $9,649, which will be adjusted by the Consumer Price Index (CPI) each year over the next two years. Once the base per-pupil amount is determined, it is adjusted upward using specific weights.

---

[5] In the proceedings below, a facilitator from the consulting company that assisted the State explained New Jersey's implementation of the PJP process and how the PJP process relies on the experience of practitioners when identifying the educational resources needed for the base education cost and the additional categorical weights assigned to significant cost factors.

[6] A district's contribution to its Adequacy Budget is established after application of the Local Fair Share formula. *See infra* at 155, 971 *A.*2d at 998.

[7] The necessary resources include "teachers, librarians, technology specialists, counselors, nurses, clerical staff, principals, assistant principals, an athletic director, lunchroom aides, professional development, supplies and materials, equipment, technology, assessment, student activities, and safety." *App.* at 213, 971 *A.*2d at 1032.

[T]he grade level weights are applied to account for the additional resources needed to educate higher grade levels. The weight for half day kindergarten students is 0.5, full day kindergarten students is 1.0, elementary students (grades 1–5) is 1.0, middle school students (grades 6–8) is 1.04, and for high school students (grades 9–12) is 1.17.

The cost per pupil for each grade level is determined by multiplying the base per pupil amount by the grade level weight. As such, the base cost for a district reflects the total amount of elementary students multiplied by $9,649, the total amount of middle school children multiplied by $10,035 (the base per-pupil with the middle school weight applied), and the total amount of high school students multiplied by $11,289.

[*App.* at 213, 971 *A.*2d at 1032 (internal citations omitted).]

The formula includes additional weights for students with the special needs identified earlier. For each at-risk pupil, a base at-risk weight of .47 is applied.[8] Also, as described by the Special Master,

the [State Department of Education (DOE)] employed a sliding scale to recognize the additional challenges faced by districts with high concentrations of at-risk students. The sliding scale applies a base at-risk weight of .47 to the base student cost for at-risk pupils in districts with an at-risk student population between zero and 20%. The weight then increases incrementally. The scale levels off at 60%— applying a weight of .57 to at-risk pupils in districts with an at-risk population over 60%. Although the at-risk weight levels off, the districts will still receive the additional funding for each at-risk student; therefore, the formula does provide more funding to districts with higher concentrations of at-risk students.

[*App.* at 215, 971 *A.*2d at 1033 (internal citations omitted).]

The formula applies weights also to LEP students (although the PJP panel suggested .47, SFRA applies a weight of .50) and yet another weight for students who are both at-risk and LEP to support non-duplicative resources required by such students (although calculated during the PJP process to be 22.6% of the LEP weight, SFRA uses 25%).

The Adequacy Budget covers two-thirds of special education costs and all costs for speech-only special education. The remaining one-third is provided to districts through categorical aid. The census-based approach used to fund the remaining one-third of

---

[8] That base represented an increase from the weights developed by the PJP panels, which were between .42 and .46. *App.* at 214, 971 *A.*2d at 1033.

special education costs is addressed later in this opinion. *See infra* at 166–67, 971 *A.*2d at 1004–05.

Finally, once the base funding is determined for a district, there is an adjustment for geographic cost. *See App.* at 220–21, 971 *A.*2d at 1036–37. The total calculation is referred to as the district's Adequacy Budget.[9]

In addition to the Adequacy Budget, SFRA's formula includes Equalization Aid, Categorical Aid, Adjustment Aid, and Education Adequacy Aid.

*Equalization Aid.* Equalization Aid is State-provided aid to support the Adequacy Budget by funding the difference between a district's Local Fair Share (LFS) and its Adequacy Budget. A district's LFS is the amount it is required to contribute in support of the Adequacy Budget. That amount is determined by adding a district's equalized property wealth and its equalized income wealth. Under SFRA, a district must provide the lesser of either its LFS, as calculated using SFRA's formula, or the local share it raised in the previous year. In short, Equalization Aid is the difference between a district's LFS and its Adequacy Budget.

*Categorical Aid.* Categorical Aid is a separate funding stream provided on a per-pupil basis for certain expenses. Categorical Aid covers: (1) one-third of census-based costs for special education; (2) security; (3) preschool aid; (4) extraordinary aid for special education; and (5) various additional aid categories. As

---

[9] SFRA provides for periodic review of the resources and costs necessary to provide the CCCS. The DOE must produce a report every three years addressing the weights making up the Adequacy Budget as well as the various additional components of SFRA. Periodic adjustments by the CPI are also required. The DOE also must analyze the census-based methodology to determine if adjustments are necessary, and the effect of growth limitations on SFRA's reliance on local levies. School district superintendents are required to study potential improvements to the pupil transportation systems.

There are also additional statutory measures designed to evaluate school district performance and fiscal accountability. *See, e.g.,* School District Fiscal Accountability Act, *N.J.S.A.* 18A:7A–54 to –60 (2009); *N.J.S.A.* 18A:7A–10 (2009) (New Jersey Quality Single Accountability Continuum).

explained by the State Commissioner of Education (Commissioner) during the hearing, Categorical Aid is "provided to ... every district at the same amount of resources." Thus, one-third of special education is funded on the basis of Categorical Aid, "regardless of the community's wealth," while the other two-thirds of the special education funding is wealth equalized. In this way, poorer communities receive more wealth-equalized resources, but every community receives the same resources for the one-third of special education funding that is provided through Categorical Aid.

Security is provided for every student in the amount of $70. Additional aid is provided for at-risk pupils using a sliding scale, which increases the amount of per-pupil aid as the district's percentage of at-risk students increases. That scale levels off at a forty percent at-risk pupil population, thereby providing $406 per pupil in additional security aid to districts having forty percent or more at-risk students in the pupil population. Security is funded entirely through Categorical Aid.

The formula also provides for transportation aid, choice aid, and debt service on the basis of per-pupil categorical aid factors.

**Preschool Aid.** SFRA requires that every school district offer a high quality preschool program to all at-risk three- and four-year-olds in its district. The per-pupil cost of such programs was calculated based on actual cost data from the high-quality Abbott preschool program, rather than through the results of the PJP process. There are three types of preschool programs, each of which receives a different amount of state funding. Under SFRA, Preschool Aid is calculated by multiplying the number of children projected to be in each program by the respective program costs per child, and then totaling all costs together.

**Extraordinary Aid.** Extraordinary Aid provides funding for special education expenses over a certain threshold. It is allocated as a reimbursement for the education of students "whose costs are extraordinary," meaning above either $40,000 or $55,000. The State reimburses ninety percent of the costs over $40,000 for

providing direct instructional and support services for such students, and the districts pay the balance. For private out-of-district programs, the State reimburses the districts seventy-five percent of the costs exceeding $55,000.

*Adjustment Aid.* Adjustment Aid is provided as transition assistance to SFRA's funding methodology. It is designed to enable districts that are spending above their Adequacy Budget to maintain their existing level of spending without significant tax levy increases. Adjustment Aid is provided if the sum of a district's Equalization Aid, Categorical Aid, Extraordinary Aid, and Transportation Aid is less than the district's 2007–2008 spending, plus two percent. If a district's current-year aid is less than that amount, the district receives Adjustment Aid for the difference.

*Education Adequacy Aid.* Education Adequacy Aid is provided to certain Abbott districts currently spending below their Adequacy Budgets. The aid is intended to help bring the district up to adequacy if the district is failing to meet education adequacy standards or is municipally overburdened.

## B.

We know from this record that there were disputes among the educational experts who testified about numerous aspects of the process used by the State to construct its funding formula, as well as the adequacy of the funding delivered through the formula. Plaintiffs challenged the use of a PJP process for devising a formula to replace the remedial orders governing funding to Abbott districts. Also, plaintiffs challenged the process as it was implemented in New Jersey, specifically the first panel's membership. At a fundamental level, plaintiffs claimed that the PJP process was inadequate because it involved the use of a "model" district, which they analogize to the approach to funding under CEIFA that was found inadequate in *Abbott IV.* Finally, much of the hearing before the Special Master focused on the State's

determination to impose a sliding scale of weights for concentrations of at-risk pupils, capped at the concentration of sixty percent.

All of those criticisms, discussed in the Special Master's Report, were raised in exceptions to the Report. Having also heard the arguments of counsel, we address each in turn.

1.

**Use of PJP process in general and as implemented in New Jersey.**

■ Plaintiffs contested the use of the PJP process to create SFRA, arguing that the approach did not focus on, or adequately take into consideration, the actual needs and costs of education in Abbott districts. As we described in detail before we remanded this matter in *Abbott XIX*, the State hired the firm of Augenblick, Palaich and Associates (APA) to conduct a PJP costing-out study of education in New Jersey. In brief, the PJP process asks panels of experts—well-regarded educators experienced in delivering the State's curricular standards in different roles—to determine the resources needed by students in order to attain the State-mandated CCCS. The report generated by APA formed the backbone of the funding formula eventually enacted as SFRA.

After hearing testimony from education experts for both plaintiffs and the State, the Special Master concluded that "APA implemented a fair process leading to an informed review of the necessary funding required to attempt to ensure a thorough and efficient education as required by the CCCS." *App.* at 210, 971 *A.2d* at 1030. In so finding, he credited the testimony of several experts, particularly that of Dean David Monk of the College of Education at Pennsylvania State University, who testified that "the use of the PJP process was reasonable and provided a systemic approach to connect the inputs and outputs of the educational funding system." *App.* at 201, 971 *A.2d* at 1025. The Special Master found not only that the PJP approach is "one of four accepted methodologies utilized to create a school funding

formula," but that it is "the most commonly accepted methodology" in use. *App.* at 195, 971 *A.*2d at 1021.

Plaintiffs argue that the State instead should have ascertained the actual spending in Abbott districts and used those costs to develop a funding formula. In support of that argument, they point to the State's use of such an approach instead of the PJP process to determine the funding level that would be allocated under SFRA to expand the Abbott preschool program to at-risk children throughout the state. Plaintiffs' logic does not compel the result they seek.

Although the State chose to use an actual-cost analysis using Abbott district data for preschool, it does not follow that that methodology would have been better suited, or even appropriate, to the more complex task of determining the funding levels that will provide for the inputs necessary for all students in the State to achieve the CCCS. We see no constitutional flaw in the State's decision to use a process regarded by national experts as one of the top four when developing a new comprehensive school funding scheme. Although the PJP process is not the only method by which the cost of providing necessary educational resources may be determined, Dean Monk viewed it as the "preferred" method for developing a grounded, need-based, statewide funding formula. We therefore adopt the Special Master's finding that, while "acknowledging [that] no one methodology can predict with unerring accuracy the monies needed to meet the standards provided (here, the CCCS)," we are "satisfied the PJP process established fairly and equitably the first step in constructing a constitutionally mandated equitable funding formula." *App.* at 210, 971 *A.*2d at 1030.

Plaintiffs further argue that implementation of the PJP process was deficient, primarily because of the composition of the panels. For example, plaintiffs argue that, unlike the prior studies in which APA was involved where the first panel of experts consisted of school-level administrators, in New Jersey the initial PJP panel was comprised solely of Department of Education (DOE) employ-

ees.[10] The criticism is factually accurate but not substantiated as a flaw in the legitimacy of the product generated by the process. The Special Master was not persuaded that this represents a material failing in the PJP process. Neither are we.

The record developed before the Special Master shows that APA had "a wealth of experience in many states and is considered a leader in the field as it concerns the PJP process." Dean Monk recognized the firm to be "very capable, able," and testified that it is "among the top experts" in the development of funding formulas through the use of the PJP process. Thus, APA's expertise in running the PJP process was well established in the record. We therefore find support for rejecting criticism of the first panel's membership in the explanation provided by APA's Vice President, Justin Ryan Silverstein, who was present and assisted the New Jersey participants during the panel processes.

Silverstein testified that based on his experience in implementing the process, the first panel's membership had sufficient professional experience to be able to identify resources necessary to achieve the defined educational objectives. He also noted that the panelists gave clear justifications for their conclusions. The Special Master gave credence to that testimony when he concluded that the PJP process was a fair and equitable first step in the creation of a constitutional funding formula. *App.* at 210, 971 *A.*2d at 1030. He further dismantled the criticism about the initial panel's composition by noting that each succeeding panel had "unbridled" freedom to change or modify the work of the previous panels and three of the eight panelists (37.5 percent) on the third panel were from Abbott districts. *App.* at 203–04, 971 *A.*2d at 1026–27.

---

[10] Three of plaintiffs' experts addressed criticisms about the panels' membership, Drs. Goertz, Belfield, and Baker. The Special Master summarized their criticisms, indicated the credence that he gave to each, and ultimately rejected those criticisms. *App.* at 202–10, 971 *A.*2d at 1026–30.

Based on that record, we conclude that although the New Jersey PJP process may have differed from the process as implemented in other states, any differences do not equate to constitutional shortcomings.

2.

**Model district.**

██ Plaintiffs also criticize the State's process because it used a "model" district, a defect that they say mirrors that which we found to exist in CEIFA. Indeed, in *Abbott XIX, supra,* we said that the State must show that, in devising SFRA, it had overcome the deficiencies we found in the development of CEIFA. 196 *N.J.* at 566, 960 *A.2d* 360. The *Abbott IV, supra,* decision, in which we addressed CEIFA, had faulted the State's use of a hypothetical school district to determine funding levels that did not account for the characteristics of Abbott districts. 149 *N.J.* at 172, 693 *A.2d* 417. According to plaintiffs, the model district used in SFRA is similarly flawed because it "was not based on the characteristics of the special needs districts." *Ibid.*

It is superficial to say that the methodology used in developing SFRA is "funding that is based on a model" and to discount it on that basis. The layered process used by the State in developing SFRA is not like the assumptive-based single model used in CEIFA. The process builds costs from the "ground up," as it has been described. The educators involved in developing the new funding formula that became SFRA were experienced and knowledgeable in delivering the CCCS in a variety of settings and for students of various types.[11] The CCCS had been implemented in all districts for years when educators were called together in

---

[11] The hypothetical districts created by the PJP process are by no means a one-size fits all approach to school funding, as was the isolated hypothetical district used in CEIFA. As stated in *Abbott IV, supra,* "the fallacy in the use of a hypothetical model school district is that it can furnish only an aspirational standard. It rests on the unrealistic assumption that ... all school districts can be treated alike and in isolation from the realities of their surrounding environment." 149 *N.J.* at 172, 693 *A.2d* 417.

panels to identify the resources needed for students at every level.[12] The same experienced educators also were asked to identify the resources needed for students having special needs or challenges. Again, those experts did so based on their experience in such matters, under the CCCS.

Thus, although those efforts were building to a formula from which per-pupil costs could be determined, it was unlike any "model" used before. Any formula can appear model-like in part, unless, of course, one is funding a statewide program based on an as-needed/individual district request basis. But with demographic changes increasingly presenting an at-risk population of pupils spread throughout the state (forty-nine percent of at-risk pupils are attending school in non-Abbott districts), the State determined that such an approach would be impracticable and unrealistic. We do not find the State's determination to be constitutionally infirm.

Furthermore, to the extent that the sliding scale of added weights for at-risk pupils, in particular, was determined from the perspective of implementation on the basis of a single district—the largest—that too does not convert SFRA's use of a "model" to the same type, or degree, of abstraction as that which concerned us about CEIFA. As the record reflects, the largest district was selected because, among other reasons, it was most likely to have higher concentrations of at-risk pupils and therefore was likely to have the most similar, and higher-cost set of needs for such pupil populations.

In sum, we do not find the State's approach to the formulation of per-pupil costs and additional weights used as the foundation for SFRA's funding formula to be constitutionally infirm.

### 3.

### Formula not specifically Abbott-district based.

In addition to disputing the appropriateness of any model to replicate the difficulties experienced when educating the disadvan-

---

[12] The fledgling CCCS were largely untested across New Jersey at the time CEIFA faced judicial scrutiny.

taged pupils of the Abbott districts, plaintiffs also challenged certain specific aspects of SFRA's formula that they claimed were deficient in addressing actual characteristics prevalent in Abbott districts. Specifically, plaintiffs cited SFRA's method of providing aid to special education pupils, the issue of municipal overburden, and the cap on the formula's sliding scale of weights for concentrations of at-risk pupils in excess of sixty percent.

Running through plaintiffs' arguments is the assumption that only with reference to specific programs and funding levels in the Abbott districts can the State show "that it has overcome the deficiencies found in CEIFA's funding provisions as applied to Abbott districts." *Abbott XIX, supra,* 196 *N.J.* at 566, 960 *A.*2d 360. Plaintiffs contend that without analyzing the actual application of SFRA to Abbott districts, it is impossible for the State to show that students in those districts will be given the opportunity to achieve a thorough and efficient education.

The State presents its case for the constitutionality of SFRA based on the premise that there may be an "alternative approach[ ] to an equitable and constitutional" school funding formula. *Abbott XIX, supra,* 196 *N.J.* at 564, 960 *A.*2d 360; *see also, Abbott IV, supra,* 149 *N.J.* at 196, 693 *A.*2d 417 (recognizing parity remedy as interim). The State argues that a school funding formula satisfies constitutional requirements if it provides sufficient financial support for the resources necessary for students to achieve the CCCS. It is the State's contention that that formula may be an entirely new approach to school funding so long as it provides the funding necessary to meet the CCCS.

We have consistently maintained "that plaintiffs' right is one of thorough and efficient educational opportunity." *Abbott IV, supra,* 149 *N.J.* at 190, 693 *A.*2d 417; *see also Abbott XIX, supra,* 196 *N.J.* at 562, 960 *A.*2d 360 (reaffirming commitment to that constitutional guarantee). Accordingly, Court-ordered funding such as the parity remedy must be viewed as "simply one judicial remedy that can help to create that opportunity." *Abbott IV, supra,* 149 *N.J.* at 190, 693 *A.*2d 417. We have been explicit in our

insistence that if the State could convincingly demonstrate that a substantive thorough and efficient education can be achieved, Court-imposed remedies would no longer be necessary. *See, e.g., Abbott XIX, supra,* 196 *N.J.* at 562, 960 *A.*2d 360; *Abbott IV, supra,* 149 *N.J.* at 196, 693 *A.*2d 417.

The State contends that showing that "SFRA was designed to exceed the requirements necessary" to provide an adequate education according to the CCCS to all students, meets that constitutional standard. *App.* at 238, 971 *A.*2d at 1047. We agree that, with the establishment of the CCCS, and a new formula designed to tie realistic expenses to the cost of delivering those educational standards to all pupils, the State has provided this Court with what we lacked in past State education funding formulas. *See Abbott IV, supra,* 149 *N.J.* at 176, 693 *A.*2d 417 ("We are, however, still without any constitutional measuring stick against which to gauge the resources needed to provide that educational opportunity other than the inputs in the DFG I and J districts.").

It is in light of our recognition of the State's prerogative to create a new form of a constitutional funding formula that plaintiffs' specific concerns about the formula's provision of funds to Abbott districts must be addressed. Plaintiffs contend that SFRA fails to account for problems specific to Abbott districts, such as municipal overburden, high concentrations of special education students, and additional costs associated with concentrations of at-risk students over sixty percent. We address each of those arguments in turn.

### (a) Municipal Overburden

■ Plaintiffs argue that SFRA is unconstitutional because it fails to account for municipal overburden in the Abbott districts. According to plaintiffs, SFRA relies on the Abbott districts to raise their LFS in order to support the Adequacy Budget, but because of municipal overburden those districts are unable to do so. The LFS is the amount that SFRA requires a district to

contribute to its Adequacy Budget. While we recognize the concern expressed by plaintiffs, we are satisfied that SFRA provides various protective measures to alleviate the initial stress placed on the districts due to the requirement that they pay their LFS.

Under SFRA, a district is required to pay the lesser value of the LFS or last year's tax levy. To make up the difference in the amounts, SFRA provides for Adjustment Aid during the transition period. Adjustment Aid ensures that no district in 2008–2009 will receive less aid than it received in the 2007–2008 year plus two percent. The amount of funding then continues in subsequent years so that no district will receive less than its 2008–2009 aid. This aid enables districts spending above their Adequacy Budget to maintain their existing level of spending without significant tax levy increases. SFRA also provides that those districts that received Education Opportunity Aid in 2008 would be eligible for additional aid if they are under adequacy as the result of municipal overburden.

In addition, there is a four percent limit on the annual tax increase for school districts. *See N.J.S.A.* 40A:4–45.44 to –45.47. Plaintiffs argue that that limit will prevent the Abbott districts from reaching their LFS in order to fund their Adequacy Budget. SFRA, however, is designed to supplement the funding for those districts that cannot raise their LFS to the amount required, to ensure that they still receive their Adequacy Budget and are fully funded. SFRA further provides for periodic review measures, specifically requiring that the Commissioner study the limitations on growth levels in the districts and their abilities to meet the LFS. A determination must be made by the end of the 2010–2011 school year as to the best way to address any continuation of municipal overburden and the failure of certain districts to raise their LFS to the amount required.

The combination of those mechanisms undercuts plaintiffs' argument that SFRA is unconstitutional because of the risk of municipal overburden. The State recognizes that municipal overburden

is a problem. Accordingly, it has provided for additional aid to those districts that are unable to raise their LFS in future years. The State expects that eventually every district will be able to contribute their LFS, but as the Commissioner testified, "they don't have to do that overnight." Therefore, at present we are satisfied that the potential for municipal overburden in Abbott districts has been addressed by the transition aid provided in SFRA.

### (b) Special Education

■ Plaintiffs take issue with the State's use of a census-based method for funding one-third of special education costs. Under that method, a statewide classification rate of 14.69% is used to calculate the amount of aid for special education. Aid is allocated by multiplying that classification rate by the total number of students enrolled in a district. Plaintiffs contend that that method is not appropriate because the State did not analyze the distribution of children with disabilities across the State. Plaintiffs presented expert testimony that studies reveal an uneven distribution of children with disabilities throughout New Jersey and that there is a correlation between higher concentrations of special education students and poverty.

In testimony before the Special Master, the State's experts explained that the State used the census-based method to fund a portion of special education costs in order to counteract the tendency of school districts to over-classify students as needing special education, a problem they specifically identified in New Jersey. The record shows that New Jersey has a higher classification rate than any other state in the country. The average classification rate in the country is 8.96%. New Jersey's classification rate is 12.54%.

Although we understand that Abbott districts may have greater numbers of special education students and therefore greater needs, we cannot conclude that SFRA's funding will be insufficient to meet those needs. The census-based method only accounts for

one-third of the special education funding. SFRA funds the other two-thirds of special education costs by allocating an excess dollar amount for each special education student in a district. Extraordinary Aid is provided to reimburse districts for the expense of providing special education for those students whose costs are extraordinary, meaning above either $40,000 or $55,000 depending on whether the services are provided in-district. As part of its periodic review, the DOE must analyze the census-based methodology to determine if adjustments are necessary. The combination of those elements of SFRA's approach to special education persuades us that SFRA is designed to provide adequate funding for special education in Abbott districts. The Commissioner's obligation to review the census-based methodology in 2010 provides reassurance that any potential deficiencies will be corrected.

### (c) At-risk weights

Plaintiffs argue that SFRA's failure to increase the at-risk weights in districts with poverty concentrations of greater than sixty percent does not account for the greater needs of those districts. Plaintiffs are particularly concerned with the sixty percent cap because twenty-four of the thirty-one Abbott districts have poverty levels in excess of sixty percent. Their experts testified before the Special Master that there are no studies supporting the proposition that when a district reaches a certain percentage of at-risk students, the per-pupil costs stabilize, rather than continuing to increase incrementally.

Of all the concerns raised by plaintiffs, the sixty percent cap was most troubling to the Special Master. We agree with the Special Master that this area is especially "worthy of consideration." *App.* at 205–06, 971 *A.2d* at 1027–28. Ultimately, however, we conclude that the State has provided a reasonable explanation for the cap and it has reassured this Court by the commitment to revise the formula should elements, such as that cap, result in insufficient funding for at-risk students.

The State explained that in developing the at-risk weights it began with numbers generated by the PJP process. The PJP panels proposed a flat weight of .46 to be applied for every at-risk student in a district. One of the experts hired by the State to review the PJP results, Dr. Odden, evaluated that result and recommended a higher flat rate of .50 instead. In his report, he noted that a rate of .50 would be among the highest in the nation. Taking that advice into consideration, the State created SFRA's sliding scale that imposes weights from .47 to .57 per at-risk student, depending on the concentration of at-risk students in a district. Thus, for example, in a district with a low concentration of at-risk students (meaning zero to twenty percent at-risk), for each at-risk student enrolled, the district would receive 1.47 times the funding it received for a student without additional needs. Although the weights do not increase in districts with over sixty percent at-risk students, each at-risk student in those districts still generates 1.57 times the base amount. In this way, a district with over sixty percent at-risk students receives more absolute dollar aid under the formula than a district with exactly sixty percent at-risk students.

In creating SFRA's sliding scale of at-risk weights, the State relied on the opinion of APA that at high concentrations of at-risk students, the additional programs needed would essentially be provided to all students, obviating the need for certain regular education programs and flattening the amount of additional funding required in those schools. The State also argues that, because the PJP process is an established method for costing-out education, the provision of more funding than was recommended by that process should reassure this Court that adequate funding is being provided under the formula.

The evidence is sufficiently convincing that the level and manner of SFRA's funding to Abbott districts for at-risk students satisfies the constitutional standard. We recognize that, in making that determination, we are choosing to give the benefit of the doubt to the State as it implements a new innovative approach to providing

sufficient resources to at-risk pupils wherever they happen to attend public school in New Jersey. In the absence of any empirical studies to prove or disprove the efficacy of a sixty percent cap, we find it reasonable for the State to have relied on the rationally explained advice and opinions of its experts and we are reassured by the State's decision to increase the weights over those initially recommended.

We do not have the prescience to know the effect that that cap, or any of the numerous decisions made by the State in creating SFRA, will have in each school district in New Jersey. Indeed, until the formula has had time to function as intended, it will be impossible to know precisely what its effect will be. Our Special Master credited the opinions and rationales of the experts whose advice the State followed when fashioning this funding formula. We accept those determinations of the Special Master and, therefore, accept as reasonable the State's exercise of judgment in developing this formula with its sliding scale of weights addressing the needs of concentrations of at-risk pupils. Our finding that that approach is not constitutionally infirm is tethered to the State's commitment diligently to review the formula after its initial years of implementation and to adjust the formula as necessary based on the results of that review. This Court remains committed to our role in enforcing the constitutional rights of the children of this State should the formula prove ineffective or the required funding not be forthcoming.

4.

Have we "reach[ed] the point where it is possible to say with confidence that the most disadvantaged school children in the State will not be left out or left behind in the fulfillment of that constitutional promise[?]" *Abbott V, supra,* 153 *N.J.* at 528, 710 *A.*2d 450. Based on the Special Master's findings, as far as it is possible to predict the effect of SFRA's design, it meets the constitutional mandate.[13] Ultimately, "[w]hether the measures for

---

[13] To the extent that plaintiffs raised additional criticisms relating to SFRA's constitutionality, based on our own review of the record, we adopt the Special

education reform that are to be implemented will result in a thorough and efficient education for the children in the Abbott districts depends, in the final analysis, on the extent to which there is a top-to-bottom commitment to ensuring that the reforms are conscientiously undertaken and vigorously carried forward." *Ibid.* SFRA will remain constitutional only if the State is firmly committed to ensuring that the formula provides those resources necessary for the delivery of State education standards across the State.

### IV.

Judgments such as the one concerning the sixty percent cap on the sliding scale of weights for at-risk pupils occurred throughout the process that led to SFRA as enacted. The record is filled with instances where DOE and its experts debated the appropriate level of resources, or cost, or weight, or scale, to use. At each such opportunity, however, they "erred" on the side of providing more generous aid.

A costing-out study such as that engaged in by the State is rife with policy choices that are legitimately in the Legislature's domain. In the record below, each value judgment attacked was demonstrated to have been made in good faith, and on the basis of available factual data informed by advice from experts, including national experts, whose testimony revealed that they had the interests of the pupils in mind. The record reflects that the Executive and Legislature have engaged in an accepted process to develop a fair and adequate funding system for use across the state. We see no reason, or basis, for us to second-guess the extraordinarily complex education funding determinations that went into the formulation of the many moving parts to this funding formula.

---

Master's analyses expressly rejecting such arguments or finding them not to require separate discussion.

It is true that the experts who testified below disagreed on many aspects of the formula and how they would operate in fact. Those disagreements do not lend themselves to one true answer, in part because of their predictive nature. The important point is that resolution of those conflicts is, in the first instance, a judgment for the Executive and Legislature to make. In *Abbott IV, supra,* we observed that "[t]he judicial remedy is necessarily incomplete ... and cannot substitute for the comprehensive remedy that can be effectuated only through legislative and executive efforts." 149 *N.J.* at 189, 693 *A.*2d 417. Our prior remedial orders were put in place due to the State's failure to create a reliable assessment of the resources needed to deliver the CCCS in districts with concentrations of disadvantaged pupils.

Now the State painstakingly has worked to develop such a record, assisted by an experienced firm that has acted as a consultant to other states facing a similar need for a rational costing out study for education funding. The State chose what it perceived to be the best overall option based on the expert justifications offered during the process of constructing the formula. This record demonstrates that there were many funding issues that were debated by education experts in good faith and collaboratively resolved during the PJP processes that led up to a draft formula. The formula then was vetted, made more generous due to the input of panels of more experts unaffiliated with the DOE, and adopted wholesale into law. Our role is not to substitute our judgment for the State's. We do not sit to second guess those nuanced and complex education funding decisions. Yet, in this instance we are effectively asked to pass on the exercise of judgment by the executive and legislative branches. Unlike in prior moments in the history of school funding litigation in this state, we do not now confront legislative inaction or failure to identify and provide realistic education funding support to at-risk children whose severe educational challenges cause their programs to be the most costly. It was previous indifference to a constitutional deprivation that started us down the *Robinson/Abbott* path.

Although that may have been our point of embarkation, today we are in a different place.

The State has constructed a fair and equitable means designed to fund the costs of a thorough and efficient education, measured against delivery of the CCCS.[14] The quality of the effort and the good faith exhibited in the exercise of discretion over and over again at decision-points during SFRA's development lead us to conclude that the legislative effort deserves deference. The Legislature and Executive have made considerable efforts to confront the difficult question of how to address the education needs of at-risk pupils, no matter where those children attend school. Those efforts are all the more impressive due to the coordinate branches' collective will to do so during difficult economic times when there is extreme pressure on scarce State resources.

Although we do not have the ability to see ahead and to know with certainty that SFRA will work as well as it is designed to work, we trust that the State will not allow our school districts to regress to the former problems that necessitated judicial intervention in the first place. Indeed, our finding of constitutionality is based, in no small part, on the expectation that the Legislature and Executive will not permit that deplorable state of affairs to recur in our school districts.

## V.

Although the Special Master recommended that SFRA be found to be constitutional, he further recommended that supplemental funding continue to Abbott districts, during and until the three year look-back review of SFRA. He did so because he could not predict SFRA's immediate and practical effect on the delivery of

---

14 At oral argument and in its exceptions to the Special Master's report, the State represented that the average 2008–2009 revenue per pupil for the Abbott districts under SFRA is $17,325, exclusive of federal funds. According to the State, the analogous figure for the I and J districts is $14,046. Although it did not present a nationwide number for 2008–2009, the State cited the national average per pupil expenditure for 2005–2006 of $9,154.

educational services in Abbott districts. *App.* at 248–49, 971 *A.*2d at 1053. The State could not have been stronger in arguing to the contrary, that it would undercut the cohesiveness of the new funding scheme to allow the continuation of supplemental funding.

This funding formula was designed to operate as a unitary whole and, in order to achieve its beneficial results, it must be allowed to work as it was intended. The many layers of costs that were factored into the base per-pupil amount, the added weights, and the many types of additional aid that are provided in order to transition districts to SFRA's funding levels, are all designed to provide sufficient resources and at the same time to incentivize fiscal efficiency.[15] As designed under SFRA's funding scheme, all districts will benefit from the formula's insistence on predictability and transparency in budgeting, and accountability, and, at the same time, at-risk children across the state will benefit.

Although we cannot evaluate with precision the changes that a switch to funding under SFRA will entail in each Abbott district, there is comfort in knowing that until the look-back evaluation of SFRA's initial years of implementation takes place, the Abbott districts will have two sources of additional money that will provide a substantial cushion of resources. We cannot ignore the State's estimation that the Abbott districts will receive, cumulatively over the next two years, approximately $630 million in federal funds.[16] In allowing that practical consideration to be a

---

[15] According to the State, the resources provided through SFRA should enable the Abbott districts to select and deliver the supplemental programs, identified in *Abbott X's* appended chart, *Abbott v. Burke,* 177 *N.J.* 578, 590, 832 *A.*2d 891 (2003), that are appropriate and necessary for their pupils. We note, as did the Special Master, that the State has never asked to eliminate supplemental programs. *See App.* at 244, 971 *A.*2d at 1050–51.

[16] The federal funding comes from a combination of three sources: Title I, 20 *U.S.C.A.* § 6301, the federal Individuals with Disabilities Education Act (IDEA), 20 *U.S.C.A.* § 1400, and the Federal American Recovery & Reinvestment Act of 2009, *Pub.L. No.* 111–5, 123 *Stat.* 115. *App.* at 246–47, 971 *A.*2d at 1052.

factor in the determination to move forward with SFRA, we perceive no inconsistency with *Abbott II*. The federal funds are not being used as a crutch against some structural failing in the funding scheme itself. Rather, we simply refuse to ignore the stark reality of such a large amount of federal funds for the Abbott districts' use during the same period in which they claim they *require* the continuation of supplemental funding.

In addition, there is also Emergency Aid that the DOE has budgeted and will have available for districts if they need it. The combination of both safety nets of considerable resources is significant and tips in favor of allowing SFRA to be implemented as it was designed. SFRA is meant to be a state-wide unitary funding system whose elements shall be subject to periodic reexamination and retooling as necessary to keep the formula operating with equity, transparency, and predictability. Because the supplemental funding may undermine or distort the effectiveness of SFRA, we decline to order its continuation over the next few years until the look-back occurs.

The State asks to implement SFRA as it was designed to gain the transparency, equity, and predictability that everyone is interested in achieving: from the parents of school age children, to district and school personnel, to average taxpaying citizens, to the district next door looking at the resources of its neighbors, and to the State as regulator and as lawmaker. With this decision, that full implementation shall proceed.

## VI.

For several decades, this Court has superintended the ongoing litigation that carries the name *Abbott v. Burke*. The Court's one goal has been to ensure that the constitutional guarantee of a thorough and efficient system of public education becomes a reality for those students who live in municipalities where there are concentrations of poverty and crime. Every child should have the opportunity for an unhindered start in life—an opportunity to become a productive and contributing citizen to our society.

The legislative and executive branches of government have enacted a funding formula that is designed to achieve a thorough and efficient education for every child, regardless of where he or she lives. On the basis of the record before us, we conclude that SFRA is a constitutionally adequate scheme. There is no absolute guarantee that SFRA will achieve the results desired by all. The political branches of government, however, are entitled to take reasoned steps, even if the outcome cannot be assured, to address the pressing social, economic, and educational challenges confronting our state. They should not be locked in a constitutional straitjacket. SFRA deserves the chance to prove in practice that, as designed, it satisfies the requirements of our constitution.

The State's motion, seeking declarations that SFRA satisfies the requirements of the thorough and efficient clause of Article VIII, section 4, paragraph 1 of the New Jersey Constitution and that the funding formula may be implemented in the Abbott districts, and further seeking an order relieving the State from this Court's prior remedial orders concerning funding to the Abbott districts, is granted. Plaintiffs' cross-motion seeking an order preserving and continuing the status quo concerning enforcement of this Court's prior remedial orders addressing funding to Abbott districts is denied.

*For on motion for review of the constitutionality of the school funding reform act of 2008*—Justices LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO, and HOENS—5.

*For on cross-motion for an interim order preserving the status quo and clarifying procedural protections*—LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO, and HOENS—5.

Raymond Arthur ABBOTT, a minor, by his Guardian Ad Litem, Frances ABBOTT; Arlene Figueroa, Frances Figueroa, Hector Figueroa, Orlando Figueroa and Vivian Figueroa, minors, by their Guardian Ad Litem, Blanca Figueroa; Michael Hadley, a minor, by his Guardian Ad Litem, Lola Moore; Henry Stevens, Jr., a minor, by his Guardian Ad Litem, Henry Stevens, Sr.; Caroline

James and Jermaine James, minors, by their Guardian Ad Litem, Mattie James; Dorian Waiters and Khudayja Waiters, minors, by their Guardian Ad Litem, Lynn Waiters; Christina Knowles, Daniel Knowles and Guy Knowles, Jr., minors, by their Guardian Ad Litem, Guy Knowles, Sr.; Liana Diaz, a minor, by her Guardian Ad Litem, Lucila Diaz; Aisha Hargrove and Zakia Hargrove, minors, by their Guardian Ad Litem, Patricia Watson; and Lamar Stephens and Leslie Stephens, minors, by their Guardian Ad Litem, Eddie Stephens, *Plaintiffs*,

v.

Fred G. BURKE, Commissioner of Education; Edward G. Hofgesang, New Jersey Director of Budget and Accounting; Clifford A. Goldman, New Jersey State Treasurer; and New Jersey State Board of Education, *Defendants*,

APPENDIX

SUPERIOR COURT OF NEW JERSEY

CHANCERY DIVISION

BERGEN COUNTY

DOCKET No. M–969

OPINION/RECOMMENDATIONS
TO THE SUPREME COURT

Hearings: February 9th, 2009 to March 3rd, 2009

Decided: March 24th, 2009

Honorable Peter E. Doyne, A.J.S.C.

Kevin R. Jesperson, Deputy Attorney General, Robert Gilson, Director of the Division of Law, Assistant Attorney General, Shannon M. Ryan, Deputy Attorney General, Gregory A. Spellmeyer, Deputy Attorney General, and Michael C. Walters, Deputy Attorney General argued the cause for defendants (Mr. Gilson,

Nancy Kaplen, Esq., Mr. Jespersen, Ms. Ryan and Mary Beth Wood, Esq. on the briefs).

David G. Sciarra, Esq., Ellen M. Boylan, Esq., and Deborah G. Splansky, Esq. (Education Law Center) and Avidan Y. Cover, Esq. and Lawrence S. Lustberg, Esq. (Gibbons P.C.), argued the cause for plaintiffs (Mr. Sciarra, Elizabeth A. Athos, Esq., Ms. Boylan, Mr. Cover, Ms. Splansky, and Theresa S. Luhm, Esq. on the brief).

Richard E. Shapiro, Esq. (Richard E. Shapiro, LLC) argued and submitted briefs on behalf *amici curiae* Boards of Education of City of Bridgeton, City of Burlington, City of East Orange, City of Elizabeth, Gloucester City, Harrison, Keansburg Borough, Jersey City Public Schools, City of Passaic, State-Operated School District of Paterson, Pemberton Township, City of Perth Amboy, Town of Phillipsburg and City of Trenton.

Harvey C. Johnson, Esq. and Rafael C. Haciski, Esq. (Wolf-Block LLP) submitted a briefs on behalf of *amicus curiae* Camden City School District.

Stephen Eisdorfer, Esq. (Hill Wallack LLP) submitted briefs on behalf of *amicus curiae* Dollar$ and Sense.

Mary A. Ciccone, Esq. submitted a brief on behalf of *amicus curiae* Disability Rights of New Jersey.

Morris G. Smith, Esq. submitted a brief on behalf of *amicus curiae* New Jersey Black Issues Convention.

Kathleen Naprstek Cerisano, Esq. (Zazzali, Fagella, Nowak, Kleinbaum & Friedman PC) submitted a brief on behalf of *amicus curiae* New Jersey Education Association.

Arnold Robinson, Esq. (Robinson, Andujar & Webb LLC) joined in the action on behalf of *amicus curiae* the Millville School District.

Ronald C. Hunt (Hunt, Hamlin & Ridley) joined in the action on behalf of amici curiae the Boards of Education of Plainfield, Pleasantville, and Irvington.

## I. *Introduction*

The New Jersey Constitution mandates the children of this State are entitled to a "thorough and efficient education." *N.J. Const.* art. VIII, § 4. The constitutional mandate is clear, yet implementation has proven to be problematic. The Court has confronted this daunting issue for almost four decades. Its efforts to work with the Legislature and the Governor have been reflected in a series of decisions beginning with *Robinson v. Cahill*, 62 *N.J.* 473 [303 *A*.2d 273] (1973), and culminating with the Court's remand order dated November 18th, 2008. *Abbott v. Burke*, 196 *N.J.* 544 [960 *A*.2d 360] (2008)(*Abbott XIX*).

The judiciary cannot shirk its constitutional responsibility but must remain mindful of its proper, yet powerful role in the governmental structure. As Chief Justice Wilentz noted "[t]he Legislature's role in education is fundamental and primary; this Court's function is limited strictly to constitutional review." *Abbott v. Burke*, 119 *N.J.* 287, 304 [575 *A*.2d 359] (1990)(*Abbott II*). The Legislature of the State of New Jersey has passed, and the Governor has signed into law, a new school funding formula titled "The School Funding Reform Act of 2008" ("SFRA"), *N.J.S.A.* 18A:7F–43 to –62. This court has been directed to examine whether this law meets constitutional mandates; that is, does SFRA represent an equitable and constitutional funding approach "that can ensure Abbott districts have sufficient resources to enable them to provide a thorough and efficient education, as defined by the [Core Curriculm Content Standards]." *Abbott XIX, supra*, 196 *N.J.* at 564 [960 *A*.2d 360].

The matter has been remanded to this court, as a Special Master, to conduct a plenary hearing to develop "a full and complete evidential record" addressing the issues raised by the parties. *Id.* at 568 [960 *A*.2d 360]. "Thorough and efficient" education has been held to require "equal educational opportunity" for all children, *Robinson, supra*, 62 *N.J.* at 513 [303 *A*.2d 273], and "must be understood to embrace that educational opportunity

which is needed in the contemporary setting to equip a child for his [or her] role as a citizen and as a competitor in the labor market." *Id.* at 515 [303 *A.2d* 273]. Justice Handler, in *Abbott v. Burke*, 153 *N.J.* 480, 490 [710 *A.2d* 450] (1998)(*Abbott V*), understood, presciently, "[d]isputes inevitably will occur and judicial intervention undoubtedly will be sought in the administration of the public education that will evolve under [the then announced] remedial standards." Despite this observation, Justice Handler, recognizing the reforms to be undertaken pursuant to Court mandate would be pursued vigorously and in good faith, also thought *Abbott V*, "should be the last major judicial involvement in the long and tortuous history of the State's extraordinary effort to bring a thorough and efficient education to the children in its poorest school districts." *Id.* at 490 [710 A.2d 450]. It is now in excess of ten years since that hope, if not expectation, was announced. The court must decide whether SFRA represents recognition of reforms instituted in good faith, which meet the constitutional mandate for a thorough and efficient education for the at-risk children in the Abbott districts, while also being mindful of the State's obligation to all 1.4 million students in New Jersey.

## II. Procedural History

The Supreme Court has addressed *Abbott v. Burke*, 100 *N.J.* 269 [495 *A.2d* 376] (1985)(*Abbott I*), and its progeny on 19 separate occasions,[1] appointing four special masters to review the

---

[1] *Abbott v. Burke*, 119 *N.J.* 287, 304 [575 *A.2d* 359] (1990)(*Abbott II*), *Abbott v. Burke*, 136 *N.J.* 444, 446 [643 *A.2d* 575] (1994)(*Abbott III*), *Abbott v. Burke*, 149 *N.J.* 145 [693 *A.2d* 417] (1997)(*Abbott IV*), *Abbott v. Burke*, 153 *N.J.* 480 [710 *A.2d* 450] (1998)(*Abbott V*), *Abbott v. Burke*, 163 *N.J.* 95 [748 *A.2d* 82] (2000)(*Abbott VI*), *Abbott v. Burke*, 164 *N.J.* 84 [751 *A.2d* 1032] (2001[2000])(*Abbott VII*), *Abbott v. Burke*, 170 *N.J.* 537 [790 *A.2d* 842] (2002)(*Abbott VIII*), *Abbott v. Burke*, 172 *N.J.* 294 [798 *A.2d* 602] (2002)(*Abbott IX*), *Abbott v. Burke*, 177 *N.J.* 578 [832 *A.2d* 891] (2003)(*Abbott X*), *Abbott v. Burke*, 177 *N.J.* 596 [832 *A.2d* 906] (2003)(*Abbott XI*), *Abbott v. Burke*, 180 *N.J.* 444 [852 *A.2d* 185] (2004)(*Abbott XII*), *Abbott v. Burke*, 182 *N.J.* 153 [862 *A.2d* 538] (2004)(*Abbott XIII*), *Abbott v. Burke*, 185 *N.J.* 612 [889 *A.2d* 1063] (2005)(*Abbott XIV*), *Abbott v. Burke*, 187 *N.J.*

issues and develop evidentiary records. No other issue has been addressed, even remotely, as frequently as the school funding cases. A short summary of the Abbott history is provided.

In New Jersey, schoolchildren have a constitutional right to a thorough and efficient education. The constitution provides as follows: "[t]he Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in this State between the ages of five and eighteen years." *N.J. Const.* art. VIII, § 4, para. 1.

For over four decades, there has been litigation between the State and classes of schoolchildren to ensure such an education is provided. Beginning in 1973, in *Robinson v. Cahill*, 62 *N.J.* 473 [303 *A.2d* 273] (1973), the Supreme Court found the State's then existing school funding plan violated the thorough and efficient education clause of the State Constitution. In 1976, the Court found a new funding scheme, the Public School Education Act of 1975 ("the 1975 Act"), *N.J.S.A.* 18A:7A–1 to –52 (repealed), to be facially constitutional. *Robinson v. Cahill*, 69 *N.J.* 449, 467 [355 *A.2d* 129] (1976).

In 1985, the *Abbott v. Burke* litigation began. *Abbott I, supra*, 100 *N.J.* at 280 [495 *A.2d* 376]. Plaintiffs in *Abbott I*,[2] schoolchil-

---

191 [901 *A.2d* 299] (2006)(*Abbott XV*), Abbott v. Burke, 196 *N.J.* 348 (2006)(*Abbott XVI*), Abbott v. Burke, 193 *N.J.* 34 [935 *A.2d* 1152] (2007)(*Abbott XVII*), Abbott v. Burke, 196 *N.J.* 451 [956 *A.2d* 923] (2008)(*Abbott XVIII*), Abbott v. Burke, 196 *N.J.* 544 [960 *A.2d* 360] (2008)(*Abbott XIX*).

[2] In 1981 at the time of filing, the lead plaintiff, Raymond Arthur Abbott ("Abbott"), was an eleven year-old Camden city grammar school student. Employing some simple math Abbott is now about 39 years-old—over two decades older than a typical high school graduate would be. *See* MaryJo Patterson and Ted Sherman, *Class of Abbott v. Burke Takes Stock*, The Star–Ledger, Jun. 8, 1997. Typically, this would raise a standing issue; however, the Court has made clear Abbott and the other named plaintiffs are a representative class. *See* Abbott I, supra, 100 *N.J.* at 277 n. 1 [495 *A.2d* 376].

dren in Camden, East Orange, Irvington, and Jersey City, challenged the constitutionality of the 1975 Act. Plaintiffs argued the funding scheme, as applied, violated the thorough and efficient education clause of the State Constitution. *Id.* at 278 [495 *A.*2d 376]. Despite the weighty constitutional issues at hand, the *Abbott I* Court held "administrative remedies should be fully explored before judicial action is sanctioned." *Id.* at 296 [495 *A.*2d 376] *(quoting Garrow v. Elizabeth General Hospital and Dispensary,* 79 *N.J.* 549, 558 [401 *A.*2d 533] (1979)).

Nonetheless, the *Abbott I* Court did address preliminarily some of the constitutional issues. In particular, the Court found "the thorough and efficient education clause ... does not require 'the legislature to provide the same means of instruction for every child in the state.'" *Id.* at 291 [495 *A.*2d 376] *(quoting Landis v. Ashworth,* 57 *N.J.L.* 509, 512 [31 *A.* 1017] (Sup.Ct.1895)). The Court noted differences in the districts "may result in different levels of spending required to achieve the same educational opportunity." *Id.* at 292 [495 *A.*2d 376]. The Court noted concerns regarding municipal overburden [3] and reliance on local tax base for funding. *Id.* at 292–93 [495 *A.*2d 376].

On remand, the Administrative Law Judge ("ALJ") held exhaustive hearings for eight months and found the following:

that evidence of substantial disparities in educational input (such as course offerings, teacher staffing, and per pupil expeditures [sic] ) were related to disparities in school district wealth; that the plaintiffs' districts, and others, were not providing the constitutionally mandated thorough and efficient education; that the inequality of educational opportunity statewide itself constituted a denial of a thorough and

---

[3] Municipal overburden is "a condition in many poorer districts where the cost of local government—police, firefighters, other municipal employees, road maintenance, garbage collection, etc.—is so high that the municipality and the school district are reluctant to increase taxes for *any* purpose, including education." *Abbott II, supra,* 119 *N.J.* at 325 [575 *A.*2d 359].

efficient education; that the failure was systemic; and that the statute and its funding were unconstitutional.

*Abbott II, supra,* 119 *N.J.* at 297 [575 *A.*2d 359].

The Commissioner of the Department of Education (the "Commissioner") rejected the ALJ's findings and found the 1975 Act constitutional, ruling in part "our Constitution d[oes] not require equal expenditures per pupil but rather require[s] a minimum substantive level of education as defined in the Act and the rules and regulations of the Board and the Commissioner." *Id.* at 299 [575 *A.*2d 359].

In *Abbott II, supra,* 119 *N.J.* 287 [575 *A.*2d 359], the Court reviewed substantively the 1975 Act. The Supreme Court held the 1975 Act "unconstitutional as applied to poorer urban school districts." *Id.* at 295 [575 *A.*2d 359]. The Court held further:

the Act must be amended to assure funding of education in poorer urban districts at the level of property-rich districts; that such funding cannot be allowed to depend on the ability of local school districts to tax; that such funding must be guaranteed and mandated by the State; and that the level of funding must also be adequate to provide for the special educational needs of these poorer urban districts in order to redress their extreme disadvantages.

*Ibid.*

Plaintiffs did not contest the 1975 Act's definition of thorough and efficient was constitutional.[4] *Id.* at 348–49 [575 *A.*2d 359].

---

4 The Court noted:

[t]he Act defines thorough and efficient education on a statewide basis as including: (a) establishment of educational goals at both the state and local levels; (b) encouragement of public involvement in goal-setting; (c) instruction intended to produce the attainment of reasonable levels of proficiency in the basic communications and computational skills; (d) a breadth of program offerings designed to develop the individual talents and abilities of pupils; (e) programs and supportive services for all pupils especially those who are educationally disadvantaged or who have special educational needs; (f) adequately equipped, sanitary, and secure physical facilities and adequate materials and supplies; (g) qualified instructional and other personnel; (h) efficient administrative procedures; (i) an adequate State program of research and development; and (j) evaluation and monitoring programs at both the state and local levels. *N.J.S.A.* 18A:7A–5.

*Abbott II, supra,* 119 *N.J.* at 349 [575 *A.*2d 359].

*Abbott II* first explained the District Factor Groups (DFGs), by which school districts are divided by socioeconomic status from A–J—A being the lowest socioeconomic status and J the highest.[5] *Id.* at 338 [575 *A.2d* 359].

In *Abbott II,* the Court revisited what constituted a thorough and efficient education noting it is "a continually changing concept." *Id.* at 303 [575 *A.2d* 359]. The Court looked to the Legislature's definition, acknowledging "[t]he Legislature's role in education is fundamental and primary; this Court's function is limited strictly to constitutional review. The definition of the constitutional provision by this Court, therefore, must allow the fullest scope to the exercise of the Legislature's legitimate power." *Id.* at 304 [575 *A.2d* 359].

The Court noted the baseline for a constitutional education:

a thorough and efficient education requires a certain level of educational opportunity, a minimum level, that will equip the student to become "a citizen and ... a competitor in the labor market." *Robinson I, supra,* 62 *N.J.* at 515, 303 *A.2d* 273. The State's obligation to attain that minimum is absolute—any district that fails must be compelled to comply. **If, however, that level is reached, the constitutional mandate is fully satisfied regardless of the fact that some districts may exceed it. In other words, the Constitution does not mandate equal expenditures per pupil.** We implied that the level can—and should—be defined in terms of substantive educational content. But while disparity was explicitly permitted, there was a caveat—the excess spending could not somehow be allowed to mask a failure to achieve thoroughness and efficiency in other districts.

*Abbott II, supra,* 119 *N.J.* at 306–07 [575 *A.2d* 359] (emphasis added).

---

5

The measurement consisted of seven factors: 1) per capita income level, 2) occupation level, 3) education level, 4) percent of residents below the poverty level, 5) density (the average number of persons per household), 6) urbanization (percent of district considered urban), and 7) unemployment (percent of those in the work force who received some unemployment compensation). Each factor is weighted in accordance with the DOE's evaluation of its relative importance as an indicator of such status, then combined by a formula that produces a numerical result.
*Abbott II, supra,* 119 *N.J.* at 338 [575 *A.2d* 359].

The *Abbott II* Court also found a thorough and efficient education requires adequate facilities. *Id.* at 362 [575 *A.*2d 359]. The Court further defined thorough and efficient as:

> more than teaching the skills needed to compete in the labor market, as critically important as that may be. It means being able to fulfill one's role as a citizen, a role that encompasses far more than merely registering to vote. It means the ability to participate fully in society, in the life of one's community, the ability to appreciate music, art, and literature, and the ability to share all of that with friends.

*Id.* at 363–64 [575 *A.*2d 359].

The Supreme Court reinforced "[the Abbott II] decision [did] not deal with optimum educational policy, but with constitutional compliance." *Id.* at 354 [575 *A.*2d 359].

In 1994, the Supreme Court tackled the Quality Education Act (QEA), *N.J.S.A.* 18A:7D–1 to –37 (repealed), enacted in 1990. *Abbott v. Burke,* 136 *N.J.* 444, 446 [643 *A.*2d 575] (1994)(*Abbott III*). The Court declared the QEA unconstitutional as applied to the special needs districts. *Id.* at 447 [643 *A.*2d 575]. The Court found the QEA failed to meet constitutional muster because it did not "assure parity of regular education expenditures between the special needs districts and the more affluent districts." *Ibid.* The QEA allowed for parity funding, but did not guarantee the funding necessary to accomplish the same. *Id.* at 448 [643 *A.*2d 575]. The Court also noted the Commissioner had failed to address supplemental programs as mandated in *Abbott II, supra,* 119 *N.J.* 287 [575 *A.*2d 359]. *Id.* at 452–53 [643 *A.*2d 575].

In 1996, the Legislature passed the Comprehensive Educational Improvement and Financing Act ("CEIFA"), *N.J.S.A.* 18A:7F–1 to –34 (repealed), which defined a thorough and efficient education by the use of substantive standards referred to as Core Curriculum Content Standards ("CCCS").[6] *Abbott v. Burke,* 149 *N.J.* 145,

---

6 The Supreme Court described the CCCS as follows:

> [t]he standards provide achievement goals applicable to all students in seven core academic areas: visual and performing arts, comprehensive health and physical education, language-arts literacy, mathematics, science, social stud-

161–62 [693 *A*.2d 417] (1997)(*Abbott IV*). The *Abbott IV* Court declared CEIFA "facially adequate as a reasonable legislative definition of a constitutional thorough and efficient education." *Id.* at 168 [693 *A*.2d 417]. Nonetheless, CEIFA was unconstitutional as applied to the special needs districts for three reasons. First, CEIFA did not link the standards to the funding actually needed to implement the content required. *Id.* at 169 [693 *A*.2d 417]. Second, there was no basis or support for the proposition aid provided under CEIFA's two supplemental program funding streams would enable various constitutionally required programs in special needs districts. *Id.* at 185–86 [693 *A*.2d 417]. Third, CEIFA failed to address the dilapidated and overcrowded conditions of special needs districts' facilities. *Id.* at 186 [693 *A*.2d 417]. The Court found further the State must provide adequate facilities regardless of "the district's willingness or ability to raise taxes or incur debt." *Id.* at 188 [693 *A*.2d 417].

The *Abbott IV* Court also mandated remedial relief in the form of additional funding to special needs districts for regular education on par with the average expenditures of the I and J districts by the start of the 1997–1998 school year. *Id.* at 189 [693 *A*.2d 417]. The funding remedy "also shall include the implementation of administrative measures that will assure that all regular education expenditures are correctly and efficiently used and applied to maximize educational benefits." *Ibid.* The Court also required the State to address special education needs. *Id.* at 190 [693 *A*.2d 417].

---

ies, and world languages. Infused throughout the seven core academic areas are five "cross-content workplace readiness standards," which are designed to incorporate career-planning skills, technology skills, critical-thinking skills, decision-making and problem-solving skills, self-management, and safety principles. The standards are not a curriculum; rather, they define the results expected without prescribing specific strategies or educational methodologies to ensure that students actually meet those expectations.

*Abbott IV, supra,* 149 *N.J.* at 161–62 [693 *A*.2d 417].

The *Abbott IV* Court "then remanded the case to the Superior Court, Chancery Division to determine what judicial relief was necessary in order to address the need for supplemental programs and facilities improvements in Abbott districts." *Abbott v. Burke,* 153 *N.J.* 480, 492–93 [710 *A.*2d 450] (1998)(*Abbott V*). The remand judge was to direct the Commissioner of Education to conduct a study and prepare a report on the unique needs of students in the special needs districts. *Id.* at 493 [710 *A.*2d 450]. The Honorable Michael Patrick King, P.J.A.D., temporarily assigned to the Chancery Division, conducted the remand proceedings and appointed Dr. Allan Odden, a professor at the University of Wisconsin–Madison, as Special Master. *Ibid.*

In 1998, the Supreme Court set forth "the remedial measures that must be implemented in order to ensure that public school children from the poorest urban communities receive the educational entitlements that the Constitution guarantees them." *Id.* at 489 [710 *A.*2d 450]. Specifically, the Court directed

> the Commissioner implement whole-school reform; implement full-day kindergarten and a half-day pre-school program for three- and four-year olds as expeditiously as possible; implement the technology, alternative school, accountability, and school-to-work and college-transition programs; prescribe procedures and standards to enable individual schools to adopt additional or extended supplemental programs and to seek and obtain the funds necessary to implement those programs for which they have demonstrated a particularized need; implement the facilities plan and timetable he proposed; secure funds to cover the complete cost of remediating identified life-cycle and infrastructure deficiencies in Abbott school buildings as well as the cost of providing the space necessary to house Abbott students adequately; and promptly initiate effective managerial responsibility over school construction, including necessary funding measures and fiscal reforms, such as may be achieved through amendment of the Educational Facilities Act.

*Id.* at 527 [710 *A.*2d 450].

Plaintiffs again appeared before the Supreme Court in 2000 on a motion in aid of litigants' rights. *Abbott v. Burke,* 163 *N.J.* 95 [748 *A.*2d 82] (2000)(*Abbott VI*). The Supreme Court granted the relief sought in part, concluding the preschool program implemented did not meet the high quality standards required by *Abbott V. Id.* at 101 [748 *A.*2d 82].

In the spring of 2000, the Court heard a motion for intervention in and for clarification of the Supreme Court's *Abbott V* decision brought by Speaker of the General Assembly, Jack Collins. *Abbott v. Burke,* 164 *N.J.* 84 [751 *A.*2d 1032] (2000)(*Abbott VII*). In *Abbott VII,* the Court confirmed in no uncertain terms, "the State is required to fund all the costs of necessary facilities remediation and construction in Abbott districts." *Id.* at 90 [751 *A.*2d 1032].

In 2002, the Supreme Court decided plaintiffs' second motion in aid of litigants' rights following the decision of *Abbott V, supra,* 153 *N.J.* 480 [710 *A.*2d 450]. *Abbott v. Burke,* 170 *N.J.* 537 [790 *A.*2d 842] (2002)(*Abbott VIII*). In *Abbott VIII,* the Court "provided a schedule for decision-making by the Executive Branch and by our Appellate Division to ensure that Abbott districts' preschool program and budget proposals are timely reviewed and that 'final dispositions are issued in time for the 2002–2003 school year.' " *Id.* at 540–41 [790 *A.*2d 842], *citing Abbott v. Burke,* No. M–1131, at 3 (N.J. Oct. 22, 2001). In addition, the Court declined to appoint a Standing Master for all Abbott matters, finding the same to be decided appropriately using the administrative process. *Id.* at 541 [790 *A.*2d 842]. Similarly, the Supreme Court noted the judiciary does "not run school systems. Under our form of government, that task is left to those with the training and authority to do what needs to be done. Only when no other remedy remains should the courts consider the exercise of day-to-day control over the Abbott reform effort." *Id.* at 562 [790 *A.*2d 842].

In the same year, due in part to State's budget crisis, the Supreme Court entered an order allowing for a one-year cessation of funding growth for certain Abbott remedial measures. *Abbott v. Burke,* 172 *N.J.* 294, 297–98 [798 *A.*2d 602] (2002)(*Abbott IX*).

In April 2003, the State moved and plaintiffs cross moved for a modification of the decision in *Abbott V, supra,* 153 *N.J.* 480 [710 *A.*2d 450]. *Abbott v. Burke,* 177 *N.J.* 578 [832 *A.*2d 891] (2003)(*Abbott X* ). The Supreme Court ordered the parties attempt to

mediate the matter before Superior Court, Appellate Division, Judge Philip S. Carchman. *Id.* at 582 [832 *A.*2d 891]. Following mediation, the parties agreed the State would continue to implement whole school reform as required by *Abbott V* with some limited exceptions. *Id.* at 583–89 [832 *A.*2d 891]. On July 10, 2003, the Supreme Court held oral argument on the one issue remaining from mediation—whether the state would be allowed to extend the one-year relaxation of remedies previously granted in *Abbott IX, supra,* 172 *N.J.* 294 [798 *A.*2d 602]. *Abbott v. Burke,* 177 *N.J.* 596, 597 [832 *A.*2d 906] (2003)(*Abbott XI*). The Court granted the State's relief as follows: "The DOE shall have the authority to treat the 2003–2004 school fiscal year as a maintenance year for purposes of calculating Additional Abbott Burke State Aid for the Abbott districts. During 2003–2004, K–12 programs provided for in the 2002–2003 school year will be continued, subject to conditions set forth [by the Court]." *Id.* at 598 [832 *A.*2d 906].

In June 2004, the Supreme Court granted a limited relaxation of the deadline for the pre-school teacher certification requirement mandated by *Abbott VI, supra,* 163 *N.J.* 95 [748 *A.*2d 82]. *Abbott v. Burke,* 180 *N.J.* 444 [852 *A.*2d 185] (2003[2004])(*Abbott XII*).

On November 1, 2004, the Supreme Court entered an order directing the parties to attempt to mediate an issue involving a modification of *Abbott X, supra,* 177 *N.J.* 578 [832 *A.*2d 891]. *Abbott v. Burke,* 182 *N.J.* 153 [862 *A.*2d 538] (2004)(*Abbott XIII*).

On December 19, 2005, plaintiffs' request for relief in aid of litigants' rights related to school facilities issues was granted in part. *Abbott v. Burke,* 185 *N.J.* 612 [889 *A.*2d 1063] (2005)(*Abbott XIV*).

Between 2005 and 2008, plaintiffs came before the Court three more times seeking orders in aid of litigants' rights. *See Abbott v. Burke,* 187 *N.J.* 191 [901 *A.*2d 299] (2006)(*Abbott XV*); *Abbott v. Burke,* 193 *N.J.* 34 [935 *A.*2d 1152] (2007)(*Abbott XVII*); *Abbott v. Burke,* 196 *N.J.* 451 [956 *A.*2d 923] (2008)(*Abbott XVIII*). In

*Abbott XV,* the Supreme Court granted the DOE's request for a funding freeze in Abbott districts for FY2007. 187 *N.J.* 191 [901 *A.*2d 299]. The Court also mandated the DOE work with districts to ensure that needed programs are maintained and that the DOE complete fiscal audits of four Abbott districts. *Ibid.* On May 22, 2006, sixteen intervenor districts sought clarification of *Abbott XV. Abbott v. Burke,* 196 *N.J.* 348 (2006)(*Abbott XVI*). In response, the Supreme Court set budget timelines and required funding for new and renovated facilities in FY2007. *Ibid.*

In *Abbott XVII,* plaintiffs moved for an order in aid of litigants' rights. 193 *N.J.* 34 [935 *A.*2d 1152]. The same was found to be premature and, as such, denied without prejudice. *Ibid.* Finally, on February 19, 2008, plaintiffs moved once again for an order in aid of litigants rights with regard to school construction funding. *Abbott XVIII,* 196 *N.J.* 451 [956 *A.*2d 923]. In *Abbott XVIII,* given the State's representations with regard to pending legislation, the Supreme Court denied plaintiffs' motion as premature. *Ibid.*

## III. *Remand*

By way of the decision decided on November 18th, 2008 and memorialized by way of an order of the Court of the same date, this matter was remanded to this court, sitting as a Special Master, to conduct a plenary hearing to develop the evidential record whether SFRA's funding formula meets constitutional muster. *Abbott XIX, supra,* 196 *N.J.* 544 [960 *A.*2d 360].

The remand was to consider whether the new funding approach adopted by SFRA provided the constitutionally required thorough and efficient education, specifically to the children in the thirty-one Abbott districts. The Court's decision made clear the "parity remedy" was not the only acceptable constitutional funding scheme. *Id.* at 563–64 [960 *A.*2d 360]. In light of the long history of the *Abbott* litigation, the Court imposed upon the State the obligation to demonstrate SFRA had developed and produced an equitable funding formula that ensures the Abbott districts have

sufficient resources that will enable them to provide a thorough and efficient education, as defined by the CCCS. *Id.* at 564–65 [960 *A.*2d 360]. The same was with the recognition the existing decisions and orders of the Court would serve as the "starting point" for an analysis of the constitutionality of SFRA as applied to the students who are the beneficiaries of the prior Court rulings. *Id.* at 551 [960 *A.*2d 360].

The Court, in its *per curiam* decision, reviewed the development of the new funding formula embodied in SFRA. It would be presumptuous, and unnecessary, to recount the same herein. The remand was to consider whether the new funding formula would accommodate the Abbott pupils' resource needs, whether the special needs of disadvantaged students in the Abbott districts would be met sufficiently, and whether SFRA's new approach is a successful alternative to the prior individual-district-needs-based approach. *Id.* at 566 [960 *A.*2d 360]. The burden of proof rested with the State. *Id.* at 565 [960 *A.*2d 360].

### IV. *Prelude to SFRA—Generally*

In November 2002, the State employed the consulting firm Augenblick, Palaich and Associates (APA) to assist in determining the cost of providing an adequate education to this State's students. Cert. of Lucille E. Davy ("Davy"), Commissioner of the New Jersey Department of Education (DOE), D–1 ¶ 4.

In designing SFRA, the DOE, in conjunction with APA, chose the Professional Judgment Panel (PJP) methodology because "it identifies the needed resources and determines the cost of providing services to students that are disadvantaged as well as to those that are not disadvantaged." D–1 ¶ 6. It also accounts for different economies of scale and incorporates input from educators. *Ibid.* PJP process involves several tasks:

(1) identifying performance standards or outcomes that define the State's educational goals;

(2) creating prototypical model school districts that reflect the state's districts;

(3) designing education resource models (including equipment, personnel, and programs) with the use of practitioner panels;

(4) determining the actual cost of the components identified in the models; and

(5) developing a funding formula which is to be used to derive the cost of providing a through and efficient education in any school district.

*Id.* ¶ 7.

In identifying performance standards, the DOE used the Core Curriculum Content Standards (CCCS), as the same were found constitutionally sufficient in *Abbott IV, supra,* 149 *N.J.* at 168 [693 *A.2d* 417]. *Abbott XIX, supra,* 196 *N.J.* at 552–53 [960 *A.2d* 360]. The CCCS "describe what students should know and be able to do in nine academic areas: visual and performing arts, comprehensive health and physical education, language arts literacy, mathematics, science, social studies, world languages, technological literacy, ... career education, and consumer, family, and life skills." Dr. Jay Doolan Cert., D–73 ¶ 14. The CCCS are a dynamic set of standards intended for all students, *id.* ¶¶ 15, 21, which are to be reviewed and updated every five years. *N.J.S.A.* 18A:7F–46(a). As such, the system for assessing the standards must be both dynamic in responding to new information and highly standardized to ensure "validity, reliability, and comparability." D–73 ¶ 21. The CCCS were developed by the DOE and adopted by the New Jersey State Board of Education (BOE) in May 1996 with a statewide assessment system then heralded as "the beginning of a new era for public schools in the State." D–73 ¶ 5. By adoption of the CCCS and the assessment systems higher expectations for all New Jersey students were brought to bear. The CCCS was the BOE's response to the *Robinson* and *Abbott* litigation. The standards were the product of a task force of educators, college professors, and representatives of business and industry who sought to create a curriculum framework in each content area. These standards were thereafter accepted by the Court as a means to define a "thorough and efficient education."

In developing the model school districts, APA analyzed information compiled from each school district in the state to create six model districts based on the demographics of school districts in

this State. Dep't of Education & Augenblick, Palaich and Associates, "Report on the Cost of Education" ("RCE"), D–2; *see also Abbott XIX, supra,* 196 *N.J.* at 553 [960 *A.*2d 360]. District information gathered included district size, grade span, and the percentage of at-risk, limited English proficiency ("LEP"), and special education students. *Id.*

In designing the resource model, the State utilized three rounds of practitioner panels. D–1 ¶ 8; *see also* D–2. The first round consisted of seven DOE employees. *Ibid.* The first panel recommended the resources needed in the six hypothetical districts. D–2 at 8. "Panel members were instructed to identify necessary resources and not to be overly constrained by concerns about cost, but they also were counseled not to design their dream school." *Abbott XIX, supra,* 196 *N.J.* at 553 [960 *A.*2d 360]. The second round included participants nominated by stakeholder groups, such as the Education Law Center (ELC), New Jersey Education Association (NJEA), and New Jersey School Boards Association (NJSBA). D–1 ¶ 8. Specifically, the second group "included whole school reform facilitators, school business administrators, superintendents, a principal, and teachers with wide cross sections of [the State's] schools." *Ibid.* The second round's large group was divided into smaller panels. *Ibid.* Each small group was assigned a school district of varying size from very small to very large. *Ibid.* These smaller groups "reviewed and modified the resources identified in round one." D–2 at 8. The third group contained eight members—five superintendents, a school board member, a school business administrator, a professor in educational leadership from Kean University. D–1 ¶ 8. The third panel provided a final set of recommendations. D–2 at 8.

In determining the actual costs of the resources needed, after the panels concluded, the DOE began to determine the costs by units rather than per pupil amounts. D–1 ¶ 10. The DOE also

updated the per pupil costs identified by the panels and calculated the weights to be applied to base per pupil amounts. *Ibid.*

On December 12, 2006, the DOE issued the RCE, reflecting the work accomplished since 2002. D–1 ¶ 11. Immediately thereafter, the Department scheduled six formal hearings for public comment on the RCE. *Id.* ¶ 14. At the hearings, the ELC and other public interest groups, NJEA, NJSBA, New Jersey Association for School Administrators, New Jersey Principals and Supervisors Association, individual legislators, taxpayers, school district employees and board members presented and/or submitted testimony. *Id.* ¶ 15.

While the hearings were being conducted, the DOE retained three nationally recognized experts in the field of school finance— Dr. Allen Odden, Dr. Lawrence Picus, and Mr. Joseph Olchefske ("Odden"; "Picus"; "Olchefske"). *Id.* ¶ 18. Doctors Odden and Picus reviewed the RCE using their evidence-based model approach ("EBM"), which identifies school programs and education strategies proven to improve student learning. *Id.* ¶ 20. Olchefske provided input as well. *Ibid.* Odden synthesized the reports into one report issued on January 19, 2007 entitled "Final Report on the Reviews of the Report on the Cost of Education in New Jersey" ("Final Expert Report"). *Ibid.* The Final Expert Report commented on areas the experts found adequate and those in which they determined the DOE should make adjustments. *Ibid.* Their recommendations have been summarized as follows:

allocate more resources for professional development; expand the definition of "at-risk" to include students eligible for a reduced-price lunch; [7] use mean, instead of median, salary data; undertake additional research into the cost of substitute pay and employee benefits; employ a newer geographic cost adjustment; and simplify

---

[7] Throughout the hearings, various witnesses referred to at-risk students as those eligible for "free or reduced price lunch," "free or reduced priced lunch," "free or reduced lunch," etc. For purposes of this decision the terms are used interchangeably.

the formula by combining the base amounts for moderate, large, and very large districts.

*Abbott XIX, supra,* 196 *N.J.* at 554 [960 *A.*2d 360].

To develop a funding formula, upon the completion of the hearings and receipt of the final expert report, the DOE sought the advice of three additional experts—Mr. Thomas Corcoran, Dr. Susanna Loeb, and Dean David Monk ("Corcoran"; "Loeb"; "Monk")—to serve as an advisory panel. D–1 ¶ 21. In addition, from April 2007 to December 2007, the DOE conducted stakeholder and legislator meetings. *Id.* ¶ 22.

In response to the final expert report and public comments, and upon consultation with the advisory panel, the DOE made changes to the funding proposal, which are set forth in the DOE's final proposal, entitled "A Formula for Success: All Children, All Communities" ("Formula for Success" or the "FFS"), D–12; *Id.* at ¶ 23. The Formula for Success sets forth the model district and educational resources that enable children to meet the CCCS, laying the foundation for SFRA. *Id.* ¶ 24.

The FFS sets forth the base costs of educational resources and augmented weights for middle and high school students. *Ibid.* It also delineates the appropriate weights for at-risk and LEP students. *Ibid.* The FFS utilizes one model district with enhanced resources in contrast to the six used in the RCE. *Id.* ¶¶ 25–26. In the single model, a large K–12 district, additional funds were provided for maintenance employees, annual capital improvements, instructional aides for at risk students, enhanced security, and other initiatives. *Id.* ¶¶ 26–27. The FFS expanded the definition of at-risk students to include those students receiving free and reduced priced lunches. *Id.* ¶ 28.

The State chose the large district as a statewide model for the following reasons as set forth by the Court:

[the State] claims that larger districts generally are more efficient and that, therefore, the use of a larger model would provide incentive for the creation of larger, more efficient districts, consistent with the Legislature's preference for such efficiencies. In addition, DOE asserts that large and extra-large districts tend to

have more at-risk students, and generally are more likely to reflect the characteristics of a greater number of districts.

*Abbott XIX, supra,* 196 *N.J.* at 555 [960 *A.*2d 360].

## V. *The PJP Process*

The Professional Judgment Panel ("PJP") approach is one of four accepted methodologies utilized to create a school funding formula. It brings educators and other individuals with knowledge of the education system together to identify resources necessary to educate students in a hypothetical district(s) to a specified standard. The process is now known as the "costing out" process. By way of the same, the level of resources needed for students to perform to specified standards, in New Jersey the CCCS, is identified.

In or about 2002 the DOE hired APA to conduct adequacy studies and to run the PJP process. There are four generally accepted methodologies to determine adequacy budgets: the successful school district approach; the PJP approach; the evidence based model approach ("EBM"); and the cost function approach. The DOE chose the PJP process which is the most commonly accepted methodology to determine adequacy budgets.

The process was described and summarized in the RCE. D–2. The PJP process was relied upon by the DOE to begin the process of the creation of a new funding formula in New Jersey.

APA is a, if not the, leading national consultant in the creation of school funding formulas utilizing the PJP process. APA has been retained by multiple states to utilize the process to develop adequacy budgets. The process is founded on the concept "the more eyes the better"; that is, the more experienced educators provide their expertise to an accepted construct, the more reliable the developed adequacy budget will be. APA identified the type of panelist required, generally experienced educators, and the DOE thereafter selected the panelists. All data provided to the various panelists was provided by the DOE.

In New Jersey, three separate panels were convened. The lists of invited panelists were identified; D–2, appendix 6, 7 and 8 representing invited panelists for rounds 1 through 3, respectively.

The PJP process begins with the development of a hypothetical district(s) that reflects the demographics of the school districts in the State; panels are then assembled to determine resources needed in that hypothetical district(s) to meet a specified standard; and the identified resources are "costed out."

In New Jersey the panelists were not provided with information concerning the then existing funding system, any of the concerns expressed in the various *Abbott* decisions or the deficiencies found therein, the supplemental program standard determined to be constitutionally required in *Abbott V* or, for that matter, any specific information as to the Abbott districts.

The first panel consisted of seven employees from the DOE.[8] The composition of this panel was challenged by the plaintiffs. Justin Ryan Silverstein ("Silverstein"), then an associate and now a partner with APA, testified he was satisfied the composition of this panel did not affect its validity.

The seven panelists comprising the first panel were given background information (D–2, appendix 4–1), various instructions (D–2, appendix 4–3), the CCCS (D–2, appendix 4–6 to 10), the assessment criteria (D–2, appendix 4–11), graduation requirements and length of school day and year (D–2, appendix 4–12). The panelists were provided a "blank slate" as to the resources to be deemed necessary. The panelists were told to limit their recommendations to what is necessary to meet the CCCS, not to construct a "dream school." D–2 at 2. An APA representative was present and acted as a facilitator after the panel was convened and provided with the above information. The panelists met on Janu-

---

[8] Although this assertion was apparently conceded, the same appears to be contravened by D–2, Appendix 6–1.

ary 21st through January 23rd, 2003 representing the longest period in APA's experience for the conduct of the first panel.

The first panel was advised the CCCS and its assessment criteria were the standards to be utilized. The panelists were then to create a hypothetical district(s). A hypothetical district(s) was purposefully used with the understanding there would be no attempt to replicate any particular district. Rather, the hypothetical district(s) was to allow educators to review and determine needs premised upon what would be recognizable to the panelists. The panel was to conduct its work premised upon a "weighted student formula." That is, the panelists used a base of 1.0 for elementary students without particular needs, and then additional characteristics were given additional weights. The four major characteristics were the size of the district, at-risk, LEP, and special education students. The weights were used to increase the base cost to provide for the resources and additional services necessary for students at higher grade levels and for students with special needs to achieve the CCCS.

Six hypothetical districts were created. Concededly, none of the hypothetical districts were premised upon information directly concerning the Abbott districts. Two districts were K–8 and were described as small and very small, and four were K–12 districts described as small, moderate, large and very large. At-risk students were defined as the percentage of low income students who were receiving free lunch, LEP students were the percentage of students in each district with limited English proficiency, and there were three levels of special education students: mild, moderate and severe. Data was assembled by the DOE and provided to the panelists with the understanding geographic location was not to be considered.

The panelists then identified resources, which the panelists constructed to include four principal categories: instructional staff, support staff, administrative staff, and other costs. Within the staff categories were various sub-categories of particularized

personnel. "Other costs" included, but without limitation, sup-
plies, equipment, technological resources, etc. Determinations
were made as to each category and its sub-categories by way of
resources needed for each. See D-2, appendix 9–23 for a com-
plete listing of the various resources addressed. The first panel
completed its work.

The second panel consisted of forty invited panelists.[9] The
panelists composition was purposefully diversified to include edu-
cators as well as other individuals including a representative of a
teachers' union, an advocacy group (interestingly, the director of
plaintiffs' counsel, The Education Law Center), a labor leader and
various educational associations. Silverstein testified this was the
first such panel that had as its members a representative of an
advocacy group and a teachers' union. The panelists were divided
into five individual panels with each panel provided a hypothetical
school district (K–8 small and very small; four K–12 small
through very large). The panelists met from February 20th
through February 21st, 2003 with Silverstein noting two days is
the average length of time for the second panel. Each panelist
received the results of the first panel by way of Excel spread-
sheets and were instructed they could make modifications as
appropriate without limitations. The second group of panelists
were also provided with the same materials as had been provided
to the first panelists, but also received the results of the first
panel. An APA representative was present for each panel and
Silverstein testified the five individual panels understood their
respective tasks, worked through the process, and produced what
was deemed necessary.

The third panel, consisting of eight panelists (D–2, appendix 8),
met on March 11th and March 12th, 2003 and reviewed the results
obtained by the first and second panels. They were also provided

---

[9] The RCE only provided information as to panelists invited, not panelists who
participated in the PJP process.

with the same information as had been received by those panels. The panelists were five school superintendents, a professor from Kean University, College of Education, a school business administrator, and a school board member. The third panelists were told to create the final resources needed to adequately fund a system that could meet the CCCS. This panel's work was more focused but, again, the panelists were told they could make changes as deemed appropriate and necessary. The third panel completed its work in March 2003. See D-2, appendix 9-1 to -43 for final determination of resources needed.

After the panel completed its work the "costing out" process was conducted by the DOE with APA's assistance. For reasons not made clear, the APA's study was put "on hold" and its report, the RCE, was released in December 2006. D-2. Although the PJP process generally only takes months to complete, the reason for the delay in the issuance of the RCE remains obscure. Despite the delay, Silverstein testified, unequivocally, the study remained reliable.

The APA thereafter reviewed the costing out process completed by the DOE and was satisfied the same was valid, reliable and credible.

Dean David Monk ("Monk" or "Dean Monk"), the Dean of the College of Education and a Professor of Educational Administration at Pennsylvania State University, was offered as an expert on behalf of the State, in part, to review the validity of the PJP process. His curriculum vitae evidenced his considerable academic achievements. D-91.

Dean Monk is a recognized expert in educational finance. His testimony was thoughtful, temperate, non-partisan and moderate in approach. Of all the experts who testified concerning the PJP process, Monk's testimony was the most considered, evenhanded and well structured.

Dean Monk has taught, researched and published concerning the subject of adequacy studies. He was qualified as an expert in education policy, finance and adequacy study methodology.

Monk was retained by New Jersey as a consultant in the summer of 2007 to advise the State on the development and implementation of a new school funding formula and to critique the PJP process, its conclusions, as well as the other studies commissioned by the defendant. He was charged specifically with reviewing the methodology utilized including the PJP process. The Dean opined the results of the PJP process and the utilization of a weighted student formula would provide an "appropriate formula" or an "acceptable result" if the process utilized was "correct" and the funding adequate.

> A Weighted Student Formula is an appropriate and reasonable method to determine school funding. Experts in the field of adequacy have not only recognized a Weighted Student Formula as an appropriate method for school funding, but the growing consensus is that it is a preferred way to develop a school funding formula.

D–123 ¶ 13.

The process, when properly conducted, is constructed to provide an equitable result for all students, both within and beyond the Abbott districts. The Dean defined "appropriate" as the considered judgment of the resources needed to meet established standards, or in New Jersey's case, the CCCS. The process yields the best estimate of the resources needed to achieve the CCCS and is applied in an "even handed" manner. One of the benefits of the PJP process is it can be tailored to fit the needs of an individual State. The process itself, according to the Dean, brings together educators with varying perspectives who can share his/her acquired wisdom and expertise as it relates to the New Jersey educational process and the system to be constructed. The PJP process has been used to develop formulas for school fundings in many states in this country.

Dean Monk commented the PJP process is one of the four generally accepted methodologies for the preparation of adequacy studies. He noted no one method is perfect, each has its own

strengths and weaknesses, but the PJP process was the most often utilized and the most popular for adequacy studies. He went so far as to reference the PJP process as the "preferred approach" and has found the same to be reliable generally and specifically as it pertained to New Jersey. Dean Monk testified it is important to have a teacher's perspective on the panel(s), but a teacher's focus is often upon the class and, therefore, should only be one voice among many needed and afforded the opportunity to participate in the process. Administrators generally bring a broader perspective to the panel. One of the particular benefits of the PJP process is there is no "over-reliance" on any one voice, such as that of a teacher.

In reviewing the RCE and APA's conduct in running the PJP process in New Jersey, the Dean noted APA's intervention was "very capable, able" and the firm and Augenblick, in particular, have a well-regarded reputation for running PJP panels. "APA are among the top experts in [the development of adequacy funding formulas through the PJP process]." D–123 ¶ 19. Augenblick, as well as APA, has a wealth of experience in many states and is considered a leader in the field as it concerns the PJP process. The Dean testified the PJP process was part of the State's "good faith effort" to construct a constitutionally permissible formula and the process itself had been conducted "in good faith." He further opined, "the use of the PJP process was reasonable and provided a systemic approach to connect the inputs and outputs of the educational funding system." D–123 ¶ 26.

The Dean was not concerned about the delay between the completion of the PJP process and the issuance of the RCE as it was his thought if the inflationary impact was considered, as it was in the instant matter, then the delay is not of moment. The same is, in part, attributable to the lack of fundamental change in resources/input information and the modest and minor changes made to the CCCS during the period of delay. As the resources/input data remains relatively stable over a three to five

year period, the delay occasioned in the instant matter was not considered to be one of significance.

Dean Monk reviewed and considered the reports of Odden, D–105, and Picus, D–74. He described both as leaders in their field who are well regarded nationally. Monk found their studies, utilizing the EBM, to be reassuring as they had both come to similar conclusions as that contained in the PJP process using different approaches.[10]

On the whole, the court found Monk to be highly persuasive and a compelling witness as his opinions were reserved, yet firm.

The principal attack on the PJP process itself on behalf of the plaintiffs was authored by Dr. Margaret E. Goertz ("Goertz"). Although Goertz' qualification as an educator cannot be gainsaid, P–1, her critique of the PJP process was less than persuasive.

Goertz has been involved with the *Abbott* litigation for in excess of twenty years. Goertz testified in the remand hearing conducted before then A.L.J. Steven L. Lefelt in 1987, and thereafter testified before the Honorable Paul G. Levy, J.S.C. and the Honorable Michael Patrick King, P.J.A.D. in conjunction with subsequent remand hearings. One is compelled to wonder whether she has developed a vested interest in the issues presented thereby precluding a dispassionate review.

Goertz' consideration of the PJP process was premised upon her review of other participants in the matter, principally Odden and Picus. She was compelled to admit both of those experts found the input/resources set forth by the PJP process were adequate to ensure a thorough and efficient education. Goertz' familiarity with the process as an adequacy methodology was premised primarily upon her reading the various reports and reviewing the methodology utilized. She acknowledged she has not conducted a

---

[10] Dean Monk's comfort level with the implementation of the SFRA was also raised as SFRA requires periodic review, which he deemed to be a "prudent" course.

PJP process, has not been a participant in the PJP process, and recognized Dr. Augenblick as "more expert" on the PJP process, how it is operated, how it is run, than she. She further acknowledged the PJP process is one of four accepted methodologies in attempting to construct an adequacy budget, but also testified she was unable to offer an opinion whether the PJP process is an appropriate method to develop an adequacy formula. Goertz, 11 T 55:23–56:6.[11]

Goertz found five flaws in the PJP process.[12] The purported flaws were as follows:

1. The first panel was comprised of State employees only;
2. There were "few" teachers on the various panels;
3. The panelists were not provided with information concerning the *Abbott* litigation and the Court's imposed remedies;
4. The age of the report; and
5. The use of a model district.

None of the purported flaws are found to be persuasive. Although it was conceded the first panel was comprised solely of DOE employees,[13] Goertz makes no mention that panels 2 and 3 were afforded unbridled authority to modify the recommendations of panel 1 as deemed appropriate. The criticism that there were "few" teachers on the panel and an under-representation of the Abbott districts, was an insight into what appears to be Goertz' vested interest. Goertz was compelled to admit on panel 3, the final panel to determine needed resources, three of the eight

---

[11] To be clear, the trial transcript is cited by indicating the witness, followed by the transcript volume number and the page and line cites. Each reporting session has a volume number starting with the a.m. reporter on day one (1 T), then the p.m. reporter on day one (2 T), the a.m. reporter on day two (3 T), and so on for the remainder of the hearing.

[12] Other criticisms authored by Goertz of the PJP process were acknowledged to have been resolved during the process leading up to enactment of SFRA and, therefore, need not be noted herein.

[13] See footnote 8.

panelists were representatives of the Abbott districts and 37.5 percent hardly represents a "small" representation. Concededly, the panelists were not provided information concerning the Abbott decisions or its imposed remedies, but the same ignores the PJP methodology which allows participants to identify needed resources to teach all children, not only those in Abbott districts. Goertz noted, as had other witnesses, the PJP process concluded in 2003 yet the report was not authored until 2006. Goertz was unable to substantiate the assertion significant changes had been made to the CCCS in the interim, which assertion was directly contravened by Commissioner Davy, although she did note subsequent to 2006 the assessment criteria had become more stringent.

Lastly, Goertz criticized the use of a model district asserting the same was "mismatched to any of the Abbott districts." The same again ignores, though, the methodology of the PJP process which always utilizes a model district with the recognition a model district is utilized with the expectation it will not mirror or replicate any particular district. It is not possible to reconcile Goertz' recognition of the PJP process as an accepted methodology while not accepting the utilization of a model district. Goertz' secondary objection concerning the use of a model district as prohibited by *Abbott IV* is apparently contravened by the remand order. Were the Court to have found utilization of a model district prohibited, as urged by Goertz, then logically there would be no need for a remand hearing as the utilization of a model district was clearly before the Court when it rendered its November 2008 decision.

While certainly understanding Goertz' position one "cannot separate the product from the process," the same should not serve to invalidate a methodology which Goertz accepted. Recognizing there is no study on any correlation between funding and educational outcome, Goertz was not prepared to opine what amount of funding was necessary to ensure a thorough and efficient education while she was compelled to acknowledge New Jersey is

one of the highest spending states in the country on educating its youth.

Dr. Clive Belfield ("Belfield") was also called as an expert on behalf of the plaintiffs. Although the primary focus of Belfield's testimony concerned supplemental programs as addressed in *Abbott V* and *X*, including high quality preschools under SFRA, he did testify concerning the PJP process. It is noteworthy, though, there is no direct mention or criticism of the PJP process in the summary of his opinions (P-18), or in his augmented certification to this court dated January 29th, 2009 (P-19). Belfield acknowledged the PJP process is one of the four accepted methodologies with no one method being clearly better than the other three. His personal preference is for a blended approach utilizing the successful school district approach with the EBM. Belfield believes it is preferable to review what programs are effective, then estimate the costs to replicate, fund accordingly and have the districts be obligated to implement successfully the program with the State being responsible for monitoring performance.

Belfield did, though, opine during the course of his testimony the PJP process in New Jersey was "poorly implemented." He first suggested the fault was not with the panelists, but rather, his conclusion of poor implementation was premised upon the flawed conclusions reached. He thereafter suggested the panelists must have been asked the wrong questions, although no specification was provided. Upon further inquiry, Belfield testified the "right" questions concerning input/resources/staffing were not posed. Belfield was particularly concerned the PJP process provided funding for at-risk populations capped at sixty percent, particularly when 24 of the 31 Abbott districts have an at-risk population exceeding that percentage and three have an at-risk population exceeding eighty percent. Belfield believed there was no literature to support capping expenses for the at-risk population at sixty percent. Belfield concluded there must have been insufficient data provided concerning at-risk students and populations in the various Abbott districts. Belfield's concern in this area is

worthy of consideration. That said, his opinion was premised upon the outcome derived, rather than the process itself.

The plaintiff also called Dr. Bruce Baker ("Baker"), a prolific writer and an energetic educator. Baker authored the most statistically comprehensive attack on the PJP process. He has been a consultant on various adequacy studies and has written widely on the subject. He was qualified as an expert in school finance, educational costing methods and studies. His primary critique of the PJP process was the process itself was "structurally flawed" and the assumptions utilized were arbitrary. From an analytic framework he criticized the PJP process in the following respects:

1. The hypothetical districts utilized did not represent adequately the Abbott districts;

2. The panelists were not provided with the Abbott mandated supplemental programs;

3. The six models utilized were prepared by the DOE rather than by the panelists which was inconsistent with prior PJP processes conducted by APA;

4. The second round panelists were over-represented by the DFG districts G, H and I and under-represented by representatives of the A, B districts including the Abbott districts; and

5. Without additional validation, the PJP process may not establish the requisite causative link between resources and outcome.

As with the other experts, Baker testified there are four accepted methodologies for conducting an adequacy study. He distilled the four methods to two:

1. Input oriented methods (the PJP and the EBM which processes estimate costs to achieve a desired outcome by identifying necessary resources); and

2. Outcome oriented methods (the cost function and successful school district approach which look to the relationship between outcomes and resources necessary to obtain those outcomes).

Baker criticizes the input methods as they are not measured against a known outcome and, therefore, the method is more hypothetically based than factually based. Baker understandably asserts the more comprehensive and relevant the data provided, the more reliable the outcome obtained. Baker believes the outcome methods are preferable as they are "less hypothetical" in

that they utilize a known outcome and, with the correct data provided properly analyzed, the more certain the result obtained.

Baker was retained by the plaintiff to review:

1. whether the funding as set forth in the SFRA is constitutionally adequate;
2. the PJP cost analysis;
3. the design of the SFRA;
4. the relationship between the PJP and the SFRA; and
5. whether the PJP process in New Jersey provides the requisite link between costs/resources necessary to achieve a desired outcome in all districts, and particularly the Abbott districts.

For purposes of this section items 2, 4, and 5 are relevant.

Baker acknowledged if the PJP process is conducted properly by informed panelists who discuss the full range of issues an acceptable result may be obtained. He acknowledged Augenblick has conducted many PJPs, had been retained by many states to perform adequacy studies using the PJP process, and Picus and Odden were recognized experts in the field of adequacy studies. Baker posits, though, the results obtained by the PJP process should be tested empirically utilizing an outcome based methodology to ensure greater reliability. He opined the result must be "validated," that there must be a "reality check."

Baker criticized the information provided to the various panelists. He noted the panelists were not provided with the Court's prior *Abbott* rulings, a list of required supplemental programs, or the staffing resources necessary to comply with the Court's mandate for the supplemental programs. He acknowledged this is not a criticism of the PJP process itself, but rather, was a failure to comply with Court mandates. As the Court has indicated the parity remedy for Abbott districts is not the *sine qua non* of a successful funding formula, this court is not prepared to accede to the assertion the PJP process cannot establish the necessary funding without the panelists being provided with the Court's prior mandates. It further presupposes the retention of the various supplemental programs is required, notwithstanding the purported constitutionality of SFRA.

Baker criticized the panelists who comprised the various panels. He testified having reviewed all of Augenblick's prior PJP panels, the first panel has generally addressed school level resources only, whereas the second panel then addressed district level resources needed, as well as considering special or additional needs. Baker noted the New Jersey PJP process was a "modified prototype" in the following respects:

1. The DOE provided the data and chose the panelists;

2. The first panelists were comprised of DOE personnel only; and

3. The second panelists comprised an over-representation of G, H and I districts and an under-representation of A and B and Abbott districts at the district level.

Baker commented, as set forth on P-54 at 9, figure 3, that 19 of the 35 invited panelists were from the G, H, and I districts, and 12 of 15 of the upper level administrators were from those same districts. Baker asserted as educators chosen to be panelists bring their own experiences to the process, over-representation by the wealthier districts may not bring to the discussion the requisite knowledge of Abbott districts, or may not adequately represent those districts' interests.

It is noted Baker suggested no attack on the work conducted by the third panel. This represents a serious deficiency in Baker's critique of panels one and two as the third panel was given the unbridled right to make changes and modifications it deemed necessary for the resources needed to meet the CCCS. This is even more significant as the Abbott districts were represented by three of the eight panelists in the third panel, or 37-½ percent.

Baker admitted there was no information available to him as to what the various panels discussed, how consensus was achieved, or even what happened during the panelists' work, nor did he have any information the panelists did not have sufficient experience to do what they were charged to do.

Baker next explored the prototype school districts used with his basic criticism the models "do not look like the Abbott districts." Baker opined there was insufficient representation of the Abbott

school districts in the models used as the models failed to account for a high percentage population of students and families in poverty as those districts were outside the hypothetical range of the six models. *See* P–54 at 11, figure 5. Further, the percentage of large Abbott districts by way of enrollment were also outside the prototypes utilized. P–54 at 12, figure 6. Baker therefore opined the six hypothetical districts did not represent adequately actual districts in New Jersey, particularly the Abbott districts and, as such, the per-pupil cost determined by the prototype as applied to the Abbott districts may be unnecessarily skewed.

Baker further criticized the process as lacking consideration of additional costs when the percentage of poverty students exceeds sixty percent, which is many of the larger Abbott districts. Baker opined the assumption costs even off after a certain poverty level is obtained is not supported adequately by any study referenced. As such, Baker, as did Belfield, questions whether the PJP process identified sufficient resources for districts with high concentration of poverty which, of course, are the Abbott districts. Baker, 17 T 99:21–100:6; Belfield, 15 T 60: 25–61:6.

Dr. Baker is a "magician" with numbers and to that deference is due. What must though be examined is whether his statistical analysis leads to a meaningful critique as contrasted to a mere statistical review of SFRA.

> Figures often beguile me, particularly when I have the arranging of them myself in which case the remark attributed to Disraeli would often apply with justice and force: There are three kinds of lies: lies, damned lies and statistics.

Mark Twain, *Autobiography of Mark Twain* 149 (Harper 1959).

The PJP process is accepted for what it was—one step in an intricate, involved methodology by which the DOE and thereafter the legislature and the Governor, attempted to construct and enact a comprehensive funding formula in an attempt to ensure a thorough and efficient education for all students in New Jersey.

It appears clear each of the four methodologies has its strengths and weaknesses and no one methodology can ensure the development of a failsafe funding formula to meet any specified standard.

That said, it also appears clear APA implemented a fair process leading to an informed review of the necessary funding required to attempt to ensure a thorough and efficient education as required by the CCCS. After due consideration of the multiple critiques of the PJP process, and acknowledging no one methodology can predict with unerring accuracy the monies needed to meet the standards provided (here, the CCCS), the court is satisfied the PJP process established fairly and equitably the first step in constructing a constitutionally mandated equitable funding formula for all districts, include the Abbott districts.

## VI. *The SFRA Formula*

SFRA is a weighted school funding formula exemplifying the tenets of equity, transparency, and predictability. Loeb, 9 T 17:5–11 and 21:3–14; D–122 ¶ 39. A weighted student formula applies a per-pupil amount to the enrollment for each school district. D–122 ¶ 23. The per-pupil amount is increased for specific needs—such as higher grade levels, at-risk students, LEP students, and special education students. *Ibid.* Dr. Susanna Loeb ("Loeb") testified "the Weighted Student Formula is an effective and appropriate means for education funding." D–122 ¶ 24. Importantly, Loeb found it is "perhaps the most appropriate funding approach." Loeb, 9 T 20:16–19.

SFRA attempts to meet three important school funding goals—equity, transparency, and predictability. *See, e.g.,* D–122 ¶ 39. First, an equitable funding approach is one that treats similar districts similarly and different districts differently. *Id.* ¶ 13. Loeb testified a weighted formula, if done properly, fulfills this goal by weighing different student characteristics. Loeb, 9 T 19:12–20:9. In focusing on equity, the Commissioner opined SFRA attempts to provide adequate funding for all at-risk students throughout the State. D–1 ¶ 48. The Commissioner noted the demographic landscape of the State has changed since *Abbott II,* yet the bulk of the State's resources are focused on Abbott districts to the detriment of other schoolchildren. D–1 ¶ 51. For

example, in 2008, 49% of at-risk students lived outside the Abbott districts—approximately 184,000 students. D–1 ¶ 49; Davy, 1 T 99:16–101:21. Yet, parity aid and supplemental aid are provided solely to the Abbott school districts. D–1 ¶ 52.

Second, transparency is an important funding goal as it enables stakeholders to determine readily the basis for funding outcomes. D–122 ¶ 16. Loeb testified transparency allows districts to know why they are receiving a particular amount of funding. Loeb, 9 T 14:7–14. This knowledge enables districts to make decisions that are more informed. *Id.* at 14:15–15:2.

Third, predictability enables districts to predict the available funding, allowing districts to plan and implement programs more effectively. D–122 ¶ 17. This works best over long time periods, providing for effective long term planning. Loeb, 9 T 15:12–20.

The legislature has found and declared the following with regard to SFRA:

[SFRA] represents the culmination of five years of diligent efforts by both the Executive and Legislative branches of State government to develop an equitable and predictable way to distribute State aid that addresses the deficiencies found in past formulas as identified by the Supreme Court. Working together toward this common goal, the Department of Education and the Legislature engaged nationally recognized experts in education funding and provided significant opportunities for stakeholder involvement and public input to assist in formulating and refining a comprehensive school funding model that has been validated by experts. The formula accounts for the individual characteristics of school districts and the realities of their surroundings, including the need for additional resources to address the increased disadvantages created by high concentrations of children at-risk.

*N.J.S.A.* 18A:7F–44(h); *see also* D–1 ¶¶ 2–3.

The SFRA formula is comprised of several components: the Adequacy Budget, Equalization Aid, Categorical Aid, Adjustment Aid, and Education Adequacy Aid. In addition, SFRA contains provisions for adjustment over time and accountability. To better understand the complicated dynamics of SFRA each component shall be addressed and explained.

a) *Adequacy Budget*

Developed from the enhanced resource model created under the FFS, the SFRA formula calculates an Adequacy Budget for each school district in the State. The Adequacy Budget is the "wealth-equalized" portion of SFRA. D-1 ¶ 39. Wealth equalized aid is based upon the community's wealth and ability to provide funding through local resources. Davy, 1 T 33:14–24; D-12 at 19. As such, a poorer community would receive more State funds and a wealthier community would receive less state funds for this type of aid. *Ibid.* A district's contribution to its Adequacy Budget is determined by running the Local Fair Share formula, explained below.

The Adequacy Budget starts with a base per pupil amount and applies the weights developed by the enhanced PJP model for grade levels and special needs to ensure similar student populations are treated similarly. Loeb, 9 T 19:12–20:9

The Adequacy Budget is composed of four categories of aid: 1) a base aid amount for elementary, middle, and high school students, 2) additional weights for at-risk and LEP students, and vocational districts,[14] 3) two-thirds of the census based costs for special education, and 4) all census-based costs for speech-only special education. D-1 ¶ 39; *N.J.S.A.* 18A:7F–51.

To illustrate how the different categories make up a district's Adequacy Budget, the formula is run for the City of Paterson at each step of the process. *See* D-83, AB439–440.[15]

---

[14] This is noted for the sake of completeness, recognizing the formula for vocational districts is not relevant to Abbott district funding, at least in significant part.

[15] The "AB" number references the Bates number for each page of the document, which can be found in the top right hand corner of each page.

### 1. *Per pupil amounts*

The base per pupil amount represents the funding necessary to provide the resources required to deliver "the [CCCS] and extracurricular and cocurricular activities necessary for a thorough and efficient education" to an elementary school student. *N.J.S.A.* 18A:7F–45; *see also* Davy, 1 T 40:24–42:5. The necessary resources include the following: teachers, librarians, technology specialists, counselors, nurses, clerical staff, principals, assistant principals, an athletic director, lunchroom aides, professional development, supplies and materials, equipment, technology, assessment, student activities, and safety. D–12 at 35.

Under SFRA the base per pupil amount for 2008–2009 is $9,649. *N.J.S.A.* 18A:7F–49. For the next two years (2009–2010 and 2010–2011), the base per pupil amount is to be adjusted by the Consumer Price Index (CPI). *Ibid.*

Once the base per-pupil amount is determined, the grade level weights are applied to account for the additional resources needed to educate higher grade levels. Davy, 1 T 26:9–14. The weight for half day kindergarten students is 0.5, full day kindergarten students is 1.0, elementary students (grades 1–5) is 1.0, middle school students (grades 6–8) is 1.04, and for high school students (grades 9–12) is 1.17. *N.J.S.A.* 18A:7F–49.

The cost per pupil for each grade level is determined by multiplying the base per pupil amount by the grade level weight. As such, the base cost for a district reflects the total amount of elementary students multiplied by $9,649, the total amount of middle school children multiplied by $10,035 (the base per-pupil with the middle school weight applied), and the total amount of high school students multiplied by $11,289. D–12 at 32.

In short, to determine the base cost for a school district, the base per-pupil amount is multiplied by the weighted enrollment of the school district. *N.J.S.A.* 18A:7F–50(b).

Base Cost [16] = Base Per-Pupil Amount × [ (ES Enroll × ES Weight) + (MS Enroll × MS Weight) + (HS Enroll × HS Weight) ]

= $9,649 × [ (12,389 × 1.0) + (6,052 × 1.04) + (6,183 × 1.17) ]

= $250,074,966

*See* D–83 at AB 439–40.

### 2. *At–Risk, LEP, and Combination Weights*

The Adequacy Budget incorporates additional weights for students' special needs requiring additional resources in three categories—at-risk pupils, LEP pupils, and at-risk/LEP or combination pupils. *N.J.S.A.* 18A:7F–51(b), (c), (d). These categories represent characteristics recognized among education policy and finance experts to affect educational costs. D–122 ¶ 25.

First, the Adequacy Budget applies an additional weight to the base per-pupil amount for each at-risk student, recognizing these students may need additional resources to meet the CCCS. *N.J.S.A.* 18A:7F–51(b). An at-risk student is one eligible for free or reduced priced lunch. *See, e.g.,* Davy, 1 T 15:25–16:13. Additional resources needed for at-risk students include social workers, instructional aides, substitutes, reading specialists, parent liaisons, after school and summer school programs, alternative education services, a guidance counselor, and professional development specialists. D–12 at 37–38.

The formula applies a base at-risk weight of .47 to every at-risk pupil. *N.J.S.A.* 18A:7F–51(b). This is an enhancement from the weights suggested by the PJP panel, which were between .42 and .46.[17] D–12 at 38.

---

[16] For purposes of this and subsequent formulas, the following abbreviations shall apply: elementary school is ES; middle school is MS; high school is HS.

[17] There is a dispute whether the array of changes from the PJP process to enactment of the SFRA are indeed "enhancements." There is no dispute, however, when the State had the option to choose an augmented amount it did so.

In addition, the DOE employed a sliding scale to recognize the additional challenges faced by districts with high concentrations of at-risk students. D–1 ¶ 32; Davy, 1 T 83:12; D–12 at 12. The sliding scale applies a base at-risk weight of .47 to the base student cost for at-risk pupils in districts with an at-risk student population between zero and 20%. Davy, 1 T 83:16–20; *see also* D–12 at 13. The weight then increases incrementally. The scale levels off at 60%—applying a weight of .57 to at-risk pupils in districts with an at-risk population over 60%. *Id.* at 84:3–5.[18] Although the at-risk weight levels off, the districts will still receive the additional funding for each at-risk student; therefore, the formula does provide more funding to districts with higher concentrations of at-risk students.

As to the "leveling off" at 60%, this resulted in part due to the PJP panels' recommendation the at-risk weight should decline at high concentrations of at-risk students. D–2 at 16. In addition, several experts have testified the decision was not unreasonable. Specifically, Silverstein, the APA representative, testified this conclusion has been reached in other PJP studies. Silverstein, 3 T 43:22–44:20. Furthermore, Picus testified there is debate among experts as to whether the costs for at-risk students would continue to increase, decline, or level off with increasing concentrations of at-risk students. D–74 at 6. Monk opined there would be some savings due to economies of scale, which would result from a district with large numbers of students with similar needs. D–123 ¶ 47. The DOE considered the advice of Odden, who recommended a flat rate of .50, which would have been amongst the highest in the nation. Attwood, 29 T 16:5–13; 27:18–30:10. In sum, there is sufficient evidence in the record leveling off at 60% was an appropriate funding decision.

---

[18] According to calculations performed by the State, the enhanced PJP model resources for elementary, middle, and high school students with a concentration of 40% at-risk students exceeds those required by *Abbott V, supra,* 153 *N.J.* 480 [710 *A.2d* 450]. D–1 at ¶ 29; *see also* D–13.

At a minimum, the Adequacy Budget for 2008–2009 would include additional funds for each at-risk elementary student in the amount of $4,535,[19] $4,716 for each at-risk middle school student, and $5,306 for each at-risk high school student.

To determine the at-risk cost for a school district, the base per-pupil amount is multiplied by the at-risk weighted enrollment of the school district and the at-risk weight for the district. *N.J.S.A.* 18A:7F–51(b).

At–Risk Cost = Base Per–Pupil Amount × [ (ES At–Risk Enroll × ES Weight) + (MS At–Risk Enroll × MS Weight) + (HS At–Risk Enroll × HS Weight) ] × At–Risk Weight
= $9,649 × [ (8,770 × 1.0) + (4,521 × 1.04) + (3,762 × 1.17) ] × 0.57 [20]
= $98,302,339

*See* D–83, AB 439–440.

Second, the formula applies weights to LEP students,[21] acknowledging extra resources are needed by these students to achieve the CCCS. *N.J.S.A.* 18A:7A–51(c). Resources for LEP students include additional teachers, substitutes, interpreters, supervisors, and programs such as summer school and after school. D–12 at 36.

The PJP panel suggested a weight of .47 for each LEP student, but SFRA applies a weight of .50. *Ibid.* These resources are greater than that determined necessary in the PJP process.

Applying the weights, SFRA provides additional aid for LEP resources in the amount of $4,825 for LEP elementary students,

---

[19] This amount is derived by multiplying base per-pupil cost by the at-risk weight for 20% at-risk population ($9,649 × .47 = $4,535).

[20] Paterson has an at-risk population over 79%, therefore it would receive the maximum statutory at-risk weight of 0.57. *See* D–12 at 32; *see also* D–84 at AB 439.

[21] In the Act, an LEP student is classified as a bilingual education student, defined as "a resident pupil enrolled in a program of bilingual education or in an English as a second language program approved by the State Board of Education." *N.J.S.A.* 18A:7F–45.

$5,017 for LEP middle school students, and $5,645 for LEP high school students. *Ibid.*

To determine the LEP cost for a school district, the base per-pupil amount is multiplied by the LEP weighted enrollment of the school district and the LEP weight. *N.J.S.A.* 18A:7F–51(c).

LEP Cost = Base Per Pupil Amount × [ (ES LEP Enroll × ES Weight) + (MS LEP Enroll × MS Weight) + (HS LEP Enroll × HS Weight) ] × LEP Weight
= $9,649 × [ (0 × 1.0) + (0 × 1.04) + (0 × 1.17) ] × 0.5
=$0.00 [22]

*See* D–83 at AB439–440.

Third, there is a separate weight for students who are both at-risk and LEP. *N.J.S.A.* 18A:7F–51(d). The intent of the combination weight is to capture the additional non-overlapping resources that these students require. D–12 at 13. The Commissioner cited two examples of overlapping resources—summer and after school programs. Davy, 1 T 32:15–33:7. In addition, Susan Ecks ("Ecks"), a planning associate for the DOE who performs research and data analysis, 4 T 83:9–15, testified concerning a chart the DOE created which listed resources deemed overlapping. Ecks, 4 T 126:15–128:19; D–119. The chart listed the following as duplicative: certain teachers, professional development, and after school and summer school programs. D–119.

The non-overlapping resources were calculated to be 22.6% of the LEP weight. Ecks, 4 T 130:6–130:13. The DOE used a slightly higher figure, 25%, in creating the combination weight. *Ibid.* The combination weight is calculated by adding 25% of the LEP weight (.125) to the district's at-risk weight (between .47 and .57 depending on the percentage of at-risk students). D–12 at 32.

To determine the LEP/at-risk cost for a school district, the base per-pupil amount is multiplied by the LEP/at-risk weighted enroll-

---

[22] In testifying about Paterson, Attwood acknowledged the strange zero LEP figure, stating all LEP students in the district are also at-risk. As such, these students fall in the combination category discussed below. 6 T 57:19–58:4.

ment of the school district and the LEP/at-risk weight. *N.J.S.A.* 18A:7F–51(d).

LEP/AR Cost = Base Per Pupil Amount × [ (ES LEP/AR Enroll × ES Weight)
+ (MS LEP/AR Enroll × MS Weight) + (HS LEP/AR Enroll × HS Weight) ]
× (AR Weight + ¼ LEP Weight)
= $9,649 × [ (1,577 × 1.0) + (429 × 1.04) + (413 × 1.17) ] × (0.57 + 0.125)
= $16,807,855

*See* D–83, at AB 439–440.

### 3. ⅔ *Cost for Special Education*

The RCE recommended wealth-equalization of the excess costs associated with special education. D–1 ¶ 36. The DOE decided to wealth equalize two-thirds of those special education costs. *Ibid.* That is, two-thirds of special education costs are accounted for in the Adequacy Budget. The remaining one-third is provided to districts as a categorical aid. *Ibid.*

Special education funding is determined using a census-based methodology to calculate the resources needed for all special education students statewide. D–1 ¶ 34. Under the census model, aid is allocated based on the average classification rate in the State (14.69%) and the average costs of educating special education students above the base per pupil amount ($10,898). D–1 ¶ 35; *see also* Loeb, 9 T 31:16–32:10; *see also* Pittman, 8 T 16:6–24. To derive the average costs above the base per pupil amount, the State took the total amount of special education funding and divided by the total number of special education students. Pittman, 8 T 17:4–16.

Loeb testified for the State concerning the census-based methodology. Loeb found the State's method of funding special education to be appropriate, as low cost special education tends to be distributed somewhat evenly throughout districts. Loeb, 9 T 34:25–37:6. In addition, Loeb opined the method can be beneficial, as it prevents "over-classification" of special education students, which can be a problem in funding formulas where districts receive additional funds for each classified child. Loeb, 9 T 32:11–34:2. In addressing the higher classification rates under other

formulas, Loeb offered "[a] plausible explanation of this result is that, because districts will receive more funding if more students are classified, districts have an incentive to over-classify." D–122 ¶ 62. Loeb did, however, acknowledge some of the "over classification" may have resulted from a greater understanding of the need for classification over time. Loeb, 9 T 66:8–16.

On the last day of testimony, Ms. Barbara Gantwerk ("Gantwerk"), DOE Assistant Commissioner of the Division of Student Services, testified about the negative effects of misclassification. Gantwerk, 29 T 6:24–7:4, 11:13–12:22. In particular, Gantwerk found overclassification can result in stigma and slowed progress for a student. *Ibid.*

In determining costs under the census-based method, the State used actual expenditures for special education (as compared to the PJP model), in part, because a study found New Jersey had significantly above-average expenditures in this area. D–1 ¶ 34; *see also* D–78 at AB00729; *see also* Davy, 1 T 89:23–91:25. In fact, this State has a higher special education classification rate than any other state in the country—12.54%; the national classification average is 8.96%. Gantwerk, 28 T 20:17–21:16; D–159. By way of comparison, the census-based model under SFRA uses a classification rate of 14.69%. *N.J.S.A.* 18A:7F–51(e).

Special education funding (excluding speech-only) is determined by multiplying a district's total enrollment by the state average classification rate and by the average special education cost. To determine the amount of funding provided under the adequacy budget, this total is multiplied by two-thirds. *N.J.S.A.* 18A:7F–51(e).

SE Census = Resident Enroll × State Avg. Classification Rate × Excess Cost × ⅔

= 24,624 × 14.69% × $10,897.75 × ⅔

= $26,280,050.60 [23]

---

[23] Here, the State's calculation appears to be off by $22. *See* D–83 at AB 439. The Court finds the difference nominal.

#### 4. *Speech-only costs*

Speech-only special education costs cover resources for students who only require speech services or language development. Davy, 1 T 35:12–21. These costs are funded fully under the Adequacy Budget. *N.J.S.A.* 18A:7F–51(e). Therefore, these costs are all wealth equalized, as the Adequacy Budget is the wealth equalized portion of SFRA.

In determining speech-only costs, the State used the PJP process as contrasted to actual expenditure data, Pittman, 8 T 20:21–21:14, as "districts do not identify expenditures for speech in a way that they could be readily identified for the actual cost analysis." D–12 at 16; *see also* D–1 ¶ 35. The average excess cost for speech-only special education is $1,082 per pupil. D–12 at 16.

In funding speech-only special education, SFRA employs the census-based method, funding districts at the average state classification rate of 1.897%. D–12 at 16.

District funding is determined by multiplying the total district enrollment by the excess cost for speech-only special education ($1,082) and by the state average classification rate for speech-only pupils. *N.J.S.A.* 18A:7F–51(e).

Speech = Resident Enroll × State Avg. Speech–Only Class Rate × Excess Cost
= 24,624 × 1.897% × $1,081.61
= $505,238.72

#### 5. *Geographic Cost Adjustment*

Once the base funding for a district is determined, it is modified by applying the Geographic Cost Adjustment ("GCA"). D–1 ¶ 38. The GCA is "an adjustment that reflects county differences in the cost of providing educational services that are outside the control of the district." *N.J.S.A.* 18A:7F–45. The GCA is applied to the Adequacy Budget to account for differences in wage markets throughout the State by county. D–12 at 31; *see also* Attwood, 5 T 58:20–24; *see also* Pittman, 8 T 27:24–28:20. The GCA method used by the DOE was based on a nationally recognized method

known as the Taylor Fowler index. *Ibid.* Rather than use the regional groupings developed in the national Taylor Fowler study, the DOE essentially divided the State by counties. Pittman, 8 T 32:12–19. Pittman testified the State altered the index because the original Taylor Fowler method "was not as careful a measure" and new census data was available for the State's use in creating the GCA. Pittman, 8 T 33:8–19.

In sum, the Adequacy Budget is determined by adding the base cost, at-risk cost, LEP cost, and LEP/at-risk combination cost, and special education adequacy budget costs, and then multiplying the sum by the GCA. *N.J.S.A.* 18A:7F–51; *see also* D–83 AB 439. The same is illustrated as follows.

Adequacy Budget = (Base Cost + At–Risk Cost + LEP Cost + Comb. Cost + Special Ed under Adeq ÷ Speech) × GCA

= ($250,074,966 ÷ $98,302,339 + $0 + $16,807,855 + $26,280,050 + $505,238) × .9987

= $391,460,887 [24]

(b) *Equalization Aid*

Equalization Aid is the State aid provided to support the Adequacy Budget. Equalization Aid funds the difference between a districts' Local Fair Share ("LFS") and its Adequacy Budget. D–1 ¶ 40; *see also* Attwood, 5 T 64:19–65:10.

LFS is a formula used to determine a district's contribution to the Adequacy Budget. D–1 at ¶ 40. It considers a community's property wealth and aggregate income, which is indexed by state-wide multipliers to ensure an equalized local tax effort. Attwood, 5 T 61:17–62:18; *see also N.J.S.A.* 18A:7F–52; *see also* D–1 at ¶ 40. The statewide multiplier or rate is the same for each district, so a district's contribution to the Adequacy Budget is determined in the same way for each district. *Ibid.*

Essentially, LFS is the amount that can be raised by local tax levy. D–1 ¶ 40. A district may raise more than its required LFS,

---

[24] In total, the State's number is off by about $24.

but increases in the local levy are subject to certain restrictions. *See N.J.S.A.* 18A:7F–38.

Under SFRA, a district must raise the lesser of its LFS under SFRA or the local share it raised the previous year or what it is raising in taxes. Attwood, 5 T 70:25–72:5; *see also N.J.S.A.* 18A:7F–59(b).

Under the formula, LFS is the sum of two calculations—equalized property wealth and equalized income wealth. Property wealth is calculated by multiplying the district's equalized property value from the prebudget year, the statewide property value rate (.0092690802), and 50%. *N.J.S.A.* 18A:7F–52(a)(c). Income wealth is computed by multiplying the district's income, the statewide income rate (.04546684), and 50%. *N.J.S.A.* 18A:7F–52(a)(c).

LFS = (Equalized Property Valuation × Statewide Property Value Rate × 50%)
 + (District Income × Statewide Income Rate × 50%)
 = ($8,449,017,781 × .0092690802 × .50) + ($1,530,452,191 × .04546684 × .50)
 = $73,949,723 [25]

Once the LFS is determined, the Equalization Aid may be derived by subtracting the LFS from the Adequacy Budget. *N.J.S.A.* 18A:7F–52(a); *see also* D–83 at AB439–440. The same may not equal less than zero. *Ibid.*

Equal Aid = Adequacy Budget—LFS
 = $391,460,863–$73,949,723
 = $317,511,140

(c) *Categorical Aid*

Categorical Aid is a separate revenue stream provided in addition to equalization aid. D–1 ¶ 41. Categorical Aid does not consider a district's wealth or ability to raise local funds. *Ibid.*; Davy, 1 T 34:24–35:11; D–12 at 19. The amount of categorical aid is determined generally by multiplying the cost per-pupil by the number of pupils eligible for the aid. D–1 ¶ 41. Categorical aid is

---

[25] The Court's calculation of $73,949,724 appears to be $1 off from the State's calculation.

provided for: 1) one-third of census based costs for special education, 2) security aid, 3) preschool aid, 4) extraordinary aid for special education, and 5) some additional aid categories. *Ibid.*

### 1) ⅓ *Costs of Census–Based Special Education*

The remaining costs related to census-based special education (those not covered in the Adequacy Budget) are funded through categorical aid. D–1 ¶ 41. To determine the census-based special education costs, one multiplies the enrollment of the school district by the state classification rate, the excess costs associated with educating special education students, and the GCA. *N.J.S.A.* 18A:7F–55(a). This sum is multiplied by ⅓ to determine the funding provided as a categorical aid.

$$\text{Categ. SE} = \text{Resident Enroll} \times \text{Class. Rate} \times \text{Excess Costs} \times \tfrac{1}{3} \times \text{GCA}$$
$$= 24{,}624 \times 14.69\% \times \$10{,}897.75 \times \tfrac{1}{3} \times 0.9987$$
$$= \$13{,}122{,}936 \ [26]$$

### 2) *Security Aid*

Security aid is provided to all students as a categorical aid. Enhanced security aid is provided to all at-risk students using a sliding scale, which accounts for the rate of at-risk students in a particular district. *N.J.S.A.* 18A:7F–56. Security aid covers costs associated with school security including security guards, metal detectors, and card readers for entering and exiting buildings. Davy, 1 T 36:9–15.

Security aid is provided for every student in the State in the amount of $70. D–12 at 14. The amount of resources needed for security aid was derived using the PJP panels. *Ibid.* In addition, further security aid is provided for at-risk pupils using a sliding scale, which increases the amount of per-pupil aid as the district's percentage of at-risk students increases. *Ibid.* The scale levels off at a 40% at-risk student population, providing $406/pupil in addi-

---

[26] Again, the State's number appears to be off by about $4. *See* D–83 at AB 439–40.

tional security aid to those districts. *Ibid.* The DOE established the additional aid amount for at-risk pupils by determining the amount of additional security guards it deemed appropriate and deriving a per pupil cost, which the DOE determined to be a maximum of $402/pupil. Attwood, 5 T 25:22–26:7; *see also* Davy, 1 T 87:18–88:11.

To calculate a district's base security aid, one would multiply the total district enrollment by the per-pupil security amount of $70, and then multiply by the GCA. To determine the additional security aid for at-risk students, one multiplies the additional aid amount (determined using the sliding scale) by the at-risk enrollment, and then adjusts using the GCA. To determine the total amount of security aid, the two sums are added together. *N.J.S.A.* 18A:7F–56; *see also* Attwood, 5 T 68:2–69:12.

Security Aid = [ (Total Enroll × Base Security Amount) + (At–Risk Enroll × At–Risk Security Amount) ] × GCA
= [ (24,624 × $70) + (19,472 × 406) ] × .9987
= $9,616,794

### 3) *Preschool under SFRA*

Recognizing the success of the Abbott high quality preschool program, SFRA expands the program to provide the same high-quality full-day preschool to all at-risk three and four year olds in the state.[27] *N.J.S.A.* 18A:7F–44(k); D–1 ¶ 55. Preschool education has probably been the singular success of the *Robinson* and *Abbott* litigation saga. The preschool program is also provided to all children (not simply at-risk children) in DFG A and B districts, and to all children in DFG C and D districts with concentrations of at-risk students above 40%. D–1 ¶ 55; *see also* Joye, 4 T 23:3–9.

In determining the resources needed, the DOE used detailed actual cost data from the high quality Abbott preschool program to determine per-pupil amounts, rather than use the preschool

---

[27] Student participation in this program is voluntary, but the district must offer the program to all interested students. Joye, 4 T 32:25–33:5.

PJP study results. D–1 ¶ 57; Davy, 1 T 119:1–120:5; *see also* D–12 at 17–18. The DOE calculated the per pupil aid amount to cover the entire cost of the program. In doing so, the DOE took the data from the Abbott districts and community providers throughout the State for needed resources—such as teacher salaries, classroom supplies, nurses, and master teachers. Joye, 4 T 15:3–13. Special requests made by the districts were not included in the per pupil amounts, as those costs are unique to particular districts and some are for one time expenditures. Joye, 4 T 17:19–18:6.

A high-quality preschool requires many resources including the following: small class sizes, master teachers,[28] parent and community involvement specialists, parent workshops, family workers, medical supplies and screening, security costs, social workers, outreach programs, and preschool intervention and referral teams. D–12 at 17; *see also* *N.J.A.C.* 6A:13A–1.1 through 11.4 (D–71). The DOE has promulgated regulations to ensure continued high quality education in the following areas: curriculum (*N.J.A.C.* 6A:13A–5.1), classroom space (*N.J.A.C.* 6A:13A–7.1), teacher certification (*N.J.A.C.* 6A:13A–4.3(a)), performance-based assessment (*N.J.A.C.* 6A:13A–5.4), and classroom quality assessment (*N.J.A.C.* 6A:13A–5.5). *See generally* Davy, 1 T 121–25.

By using actual cost data, the State ensured the components of the successful Abbott preschool programs could be implemented for all at-risk children throughout the State. As such, the preschool programs must meet the Abbott quality standards (e.g. small class size, research based curriculum, certificated teachers). The programs may be offered by the districts, by community providers, neighboring districts or regional entities. D–1 ¶ 56.

---

[28] A master teacher supports the teacher's classroom work without direct teaching responsibilities. Joye, 4 T 9:4–13. A master teacher uses his/her additional background and coursework to assist a subset of 20 teachers in ensuring the curriculum is age appropriate and delivered properly. Davy, 1 T 122:10–16.

There are three types of preschool programs; each program receives a different amount of state funding. First, an in-district program is one provided inside a district school building. Davy, 1 T 119:18–23. Second, a private provider would be a nursery school or other preschool program in the community. *Id.* at 119:25–120:1. Third, a Head Start program receives funds only as a supplement to the funds provided by the federal program. *Id.* at 120:2–5.

The per pupil preschool amounts for each type of program are as follows-$11,506 for in district, $12,934 for private providers, and $7,146 for Head Start. D–1 ¶ 57; Davy, 1 T 119:12–120:5; *see also N.J.S.A.* 18A:7F–54(d). The base per pupil amounts are adjusted using the CPI for two years, but every three years the amounts are reevaluated and readjusted. Joye, 4 T 28:2–25.

Abbott preschool funding allocations for school year 08–09 are governed by the budgets already issued by the DOE. D–1 ¶ 58. Henceforward, Abbott preschools will receive the greatest of three preschool funding allocations: 1) per-pupil allocation under SFRA, 2) the district's per pupil allocation in its approved 08–09 early childhood plan, or 3) the district's total 08–09 preschool aid amount with an enrollment adjustment. *Ibid.*; Joye, 4 T 29:19–30:10; *see also N.J.S.A.* 18A:7F–54. The allocations based on the 08–09 preschool budgets (options 2 or 3) would include any funding approved for special requests. Joye, 4 T 31:9–14.

Under SFRA, preschool aid is calculated by multiplying the number of children in each program (not including preschool disabled) by their respective program costs and adding the total costs for each program together. *N.J.S.A.* 18A:7F–54(a).

Preschool Aid = (In–District program Enroll × $11,506) + (Private Provider Enroll × $12,934) + (Head Start Enroll × 7,146)

4) *Extraordinary Aid for Special Education*

Extraordinary Aid funds special education costs over a certain threshold as a categorical aid. *N.J.S.A.* 18A:7F–55(b)(4); *see also* Davy, 1 T 36:17–20. This aid is distributed as a reimbursement

for extraordinarily high costs for special education resources. D–1 ¶ 37. Loeb testified high-cost special education is not evenly distributed across districts. Loeb, 9 T 35:13–36:8. Therefore, a census-based approach for funding these costs would not be appropriate; reimbursement of the high costs is the better approach. *Ibid.*

Under SFRA for in-district placements, the State reimburses 90% of the costs over $40,000 for providing direct instructional and support services. D–1 ¶ 37. For public placements under SFRA, the State reimburses 75% of the costs for direct instruction and support services over $40,000. *Ibid.* For private out of district programs, the State reimburses 75% of the costs over $55,000. *Ibid.* For FY2009, the Governor has increased the percentage reimbursed for all placements: for in-district programs 95% of costs over $40,000 will be reimbursed; for public placements 85% over $40,000 will be reimbursed; for private out of district programs 85% over $55,000 will be reimbursed. *Ibid.*

To calculate extraordinary special education for an in-district classified pupil, one would subtract $40,000 from the actual cost of aid for the in-district program and multiply the sum by 90%; for a student in a separate public school, $40,000 is subtracted from the actual cost and multiplied by 75%; and for a student in a private school, one would subtract $55,000 from the actual cost and multiply by 75%. *N.J.S.A.* 18A:7F–55(b)(4). To determine the total district extraordinary education aid, one would simply add the three totals together. *Ibid.*

5) *Additional Categorical Aids*

The formula also provides for transportation aid, choice aid,[29] and debt service aid. D–1 ¶ 42; *see* D–12 at 22–24. These additional aid categories are distributed based on the characteris-

---

[29] Choice aid is a small program provided to a district receiving additional students from other neighboring districts. Attwood, 5 T 70:14–19.

tics of the district. Attwood, 5 T 70:4–6. Further explanation of the same is not necessary; suffice it to say these aids provide additional revenue streams to the districts.

### (d) *Adjustment Aid*

For the transition to SFRA, Adjustment Aid enables districts spending above adequacy to maintain their current level of spending without significant tax levy increases or reductions in programs and services. *N.J.S.A.* 18A:7F–58; *see also* D–1 at ¶ 43; *see also* Attwood, 5 T 72:6–22. Specifically, Adjustment Aid provides funding to ensure "no district in the state would receive less aid in the 2008/2009 school year than it received in a previous year and plus two percent." Attwood, 5 T 72:18–22. The funding then continues in subsequent years, so that no district receives less than its 2008–2009 aid, absent a significant decrease in the district's enrollment. *N.J.S.A.* 18A:7F–58(a)(2)(3).

It should be noted, beginning in 2009–2010, and continuing in 2010–2011, total aid does not increase funding to many districts by way of a CPI adjustment or otherwise. *See* P–40. Such "flat funding," as many of the plaintiffs' witnesses refer to it, is a major source of concern to the Abbott districts. It is asserted flat funding would not ensure districts could continue their current programs, as the costs of salaries and benefits alone increase, on average, 4% per year.[30]

In short, Adjustment Aid is provided if the sum of a district's equalization aid, security aid, special education categorical aid, extraordinary aid, and transportation aid—essentially, state aid— is less than the district's 2007–2008 spending plus two-percent. If the current year's aid is indeed less, the district receives adjustment aid for the difference.[31]

---

[30] This number is derived from anecdotal evidence provided by the plaintiffs' various district witnesses.

[31] If the district is receiving choice aid, this is subtracted from the adjustment aid.

Adjust Aid = (07–08 State Aid × 1.02)—(Equalization Aid + Security Aid + Special Education Categorical Aid + Extraordinary Aid + Transportation Aid)
= ($382,779,688 × 1.02)—($317,511,140 + $9,616,794 + $13,122,932 + $1,328.889 ⊢ $2,886,325)
= $390,435,282–$344,466,080
= $45,969,202

(e) *Education Adequacy Aid ("EAA")*

An Abbott district spending below its Adequacy Budget may be eligible for state aid to bring it up to adequacy within three years. D–1 ¶ 44, 45; *N.J.S.A.* 18A:7F–58(b); *see also* Attwood, 5 T 78:20–79:15. An Abbott district may receive EAA if it received Education Opportunity Aid in 2007–2008 and meets one of two criteria: 1) the district fails to meet education adequacy standards or 2) the district is municipally overburdened. D–1 ¶ 45; Atwood, 5 T 78:20–79:15.

(f) *Periodic Review Measures*

SFRA provides mechanisms for review and revision of the Act periodically to ensure the funding still adequately meets the needs of the State's school districts. *See N.J.S.A.* 18A:7F–46.

First, the CCCS must be reviewed and updated every five years. *N.J.S.A.* 18A:7F–46(a). In addition, the resources and costs necessary to provide the CCCS must be reviewed and updated every three years in an Education Adequacy Report, presented to the legislature. *N.J.S.A.* 18A:7F–46(b). The Report must address base per pupil amounts, grade level weights, at-risk weights, LEP weights, combination weights, security aid, transportation aid, special education costs, and extraordinary special education aid thresholds. *Ibid.* In the interim years, the following must be adjusted by the CPI: base per-pupil amounts, per-pupil amounts for full day preschool, excess costs for general special education and speech-only special education, and the cost-coefficients for security and transportation aid. *Ibid.* The Commissioner is to revise the GCA every five years upon receipt of the census data. *N.J.S.A.* 18A:7F–51(a).

For special education, the Commissioner is to study the census-based methodology to determine if adjustments are needed. The recommendations and report are due by June 30, 2010. *N.J.S.A.* 18A:7F–55(f).

With regard to the local levy, the Commissioner must study the effect of growth limitations under SFRA by the end of the 2010–2011 school year to determine what would be the best way to address this issue. *N.J.S.A.* 18A:7F–59.

As for transportation, each executive county superintendent of schools "shall complete a study of pupil transportation services....to determine ways to provide pupil transportation services in a more cost-effective and efficient manner." *N.J.S.A.* 18A:7F–57(d). The Commissioner may consider these recommendations in preparing the first Educational Adequacy Report. *See ibid.* and *N.J.S.A.* 18A:7F–46(b)(4).

### (g) *Accountability Measures*

SFRA works in conjunction with other accountability measures to ensure transparency and efficiency in the delivery of education service. D–1 ¶ 60. First, the New Jersey Quality Single Accountability Continuum ("NJQSAC"), *N.J.S.A.* 18A:7A–10, evaluates thoroughness and efficiency every three years. D–1 ¶¶ 61–62. NJQSAC evaluates five key components of school district effectiveness: (1) instruction and program, (2) personnel, (3) fiscal management, (4) operations, and (5) governance. *N.J.S.A.* 18A:7A–10. Second, the School District Fiscal Accountability Act ("SDFAA"), *N.J.S.A.* 18A:7F–55, authorizes the Commissioner to appoint a monitor in districts with certain severe fiscal circumstances. D–1 ¶ 72.

### (h) *Summary*

While exceedingly complex, the SFRA formula represents a well considered, even expansive, formula to allow a thorough and

efficient education for all children in the State. The same, by definition, would include the children in the Abbott districts.

## VII. *Defendants' Case*

The defendants called eleven witnesses during their direct case and three witnesses in rebuttal. Principally, the witnesses testified concerning the development of SFRA, its structure, and its implementation. As the same has already been addressed it shall not be repeated herein. Suffice it to say, the State, principally by way of Commissioner Davy and Assistant Commissioner Atwood, fervently urge SFRA meets the constitutional requirements of a thorough and efficient education for all students in New Jersey, but particularly for those students who reside within the thirty-one Abbott districts. Davy and Atwood were significantly involved in the development of SFRA and its subsequent implementation.

SFRA was described and presented as an attempt to construct a formula that would apply to all districts in New Jersey as it was perceived the prior system was both inefficient and inequitable. An attempt was therefore made to create a single, uniform formula rather than continue with the presently utilized dual system; that is, one for the Abbott districts and one for all other districts. SFRA attempts to determine the resources needed premised upon a per-pupil weighted formula rather than a system that was district based. It was an attempt to make statewide school funding more equitable, transparent, and predictable. At the same time, SFRA attempts to ensure during the transition process the Abbott districts will continue to receive sufficient funding to allow the continuation of a thorough and efficient education. In the first year of SFRA funding, the Abbott districts received an average per pupil revenue of $17,325; the average per pupil revenue for the I & J districts was $14,046. D–62. That is, the average per pupil revenue provided to the Abbott districts under SFRA is 23.3 percent higher than the revenues provided in the I & J districts. The same must also be understood in light of

the national average per pupil spending in 2005–2006, the last year statistical evidence was available, was $9,154. D–136.

The court was impressed with the evolution of SFRA, the efforts taken attempting to construct an equitable formula which would not only be fair to all students in New Jersey, but which would also ensure more than adequate funds were available for the students in the Abbott districts. Not only were six national experts retained in an effort to ensure adequate funding, but those experts who testified, testified in a measured, nonpartisan and thoughtful manner. Uniformly, the defendants' experts testified the process utilized by the State in attempting to develop an equitable formula was appropriate if not commendable. Dean Monk's observation the development of SFRA should serve as the national model for the development of a school funding formula is accepted with his recognition the development of any formula cannot meet the requirements of perfection. Monk, 12 T 77:1–17.

## VIII. *Plaintiffs' Case*

The plaintiffs called eighteen witnesses in their case in chief. Six were experts in the field of education—Goertz, Mr. Melvin Wyns ("Wyns"), Dr. Ernest Reock ("Reock"), Dr. Jon Karl Erickson ("Erickson"), Belfield, and Baker. The remaining twelve witnesses were educators, administrators, and a student from New Jersey districts. The district witnesses were Dr. Colleen LaRocca Malleo ("LaRocca Malleo"), Dr. H. Victor Gilson ("Gilson"), Ms. Olga Hugelmeyer ("Hugelmeyer"), Mr. George Chando ("Chando"), Mr. Patrick J. Fletcher ("Fletcher"), Dr. Roy Montesano ("Montesano"), Ms. Jane Ottinger ("Ottinger"), Ms. Shelly Schneider ("Schneider"), Dr. Clarence Hoover ("Hoover"), Dr. Dennis Clancy ("Clancy"), Mr. Ronald Lee ("Lee"), and Ms. Victoria Scott ("Scott").

The first expert, Goertz, raised concerns focused on the inadequacy of SFRA funding and the PJP process. The second expert, Wyns also found SFRA to be insufficient; Wyns based his opinion, in part, on the premise all funding approved previously is neces-

sary for a thorough and efficient education. This assumption is simply not persuasive. Reock commented on the recent state funding freezes, opining the freezes have caused disparity between low income Abbott and non-Abbott districts. Reock cautioned without Abbott funding the Abbott districts would have no recourse should there be future funding freezes. Erickson testified about the municipal overburden still plaguing Abbott districts; but, SFRA considers this municipal overburden in structuring local share and equalization aid. Belfield expressed concerns not all supplemental programs and services would or could be implemented under SFRA. These concerns are addressed in the supplemental programs and funding section below, therefore the same will not be set forth here. Finally, Baker raised concerns about the PJP process, questioned whether the changes from the PJP to SFRA were indeed "enhancements," and challenged the validity of the SFRA base cost. Baker's concerns were addressed previously in the sections on the PJP process and SFRA.

As for the district witnesses, generally, they appeared to be hardworking, forthright, and dedicated educators. Without delineating the testimony of each district witness here, the thrust of their concerns were under SFRA the districts would suffer severe funding constraints. Several districts listed the various cuts and/or alterations they would need to make or have made to meet the SFRA limitations. Many district educators opined it would not be possible to provide a thorough and efficient education with any reduction in their present funding; some testifying every dollar spent currently is necessary to provide a thorough and efficient education. With all due respect to the district representatives commendable efforts on behalf of their students, this assumption is simply rejected. To argue there are no inefficiencies within a district and that every dollar spent currently is necessary to provide a thorough and efficient education is simply unreasonable. Furthermore, some of the "necessities" discussed during the hearings seem overly aspirational—a digital camera for preschool classrooms, three field trips per year as compared to

two field trips per year, etc. Quite a few districts raised concerns about what they defined unanimously as "flat funding"—funding that would not be inflated by the CPI or otherwise adjusted upwards. The districts contended stagnant funding and even funding adjusted using the CPI is akin to a reduction, as certain fixed costs increase approximately 4% per year, such as, teacher salaries and benefits.

## IX Legal Analysis

### A. Constitutional "As Applied" Challenge

The issue present is whether the funding formula set forth by SFRA is a constitutionally valid replacement for the funding methodology ordered previously by the Court. *Abbott XIX, supra*, 196 *N.J.* at 551–52 [960 *A*.2d 360].

A statute may be declared unconstitutional in one of two manners. First, it may be declared invalid "on its face." [32] Second, a statute may be found unconstitutional "as-applied" to a particular set of circumstances. *See State v. Cameron*, 100 *N.J.* 586, 594 [498 *A*.2d 1217] (1985).

The Supreme Court has held "[f]acial challenges are disfavored for several reasons." *Wash. State Grange v. Wash. State Republican Party*, [—— *U.S.* ——, ——] 128 *S.Ct.* 1184, 1191 [170 *L.Ed*.2d 151] (2008). First, "they raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Ibid.* (quoting *Sabri v. United States*, 541 *U.S.* 600, 609 [124 *S.Ct.* 1941, 158 *L.Ed*.2d 891] (2004)). Second, "[f]acial challenges ... run contrary to the fundamental principle of judicial restraint that courts should neither 'anticipate a question of constitutional law in

---

[32] *See* Richard H. Fallon, Jr., *As–Applied And Facial Challenges and Third–Party Standing*, 113 Harv. L.Rev. 1321, 1324 (2000) ("The incidence and success of facial challenges are not ... governed by any general formula defining the conditions for successful facial challenges. Instead, the availability of facial challenges varies on a doctrine-by-doctrine basis and is a function of the applicable substantive tests of constitutional validity.")

advance of the necessity of deciding it' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Wash. State Grange*, 128 *S.Ct.* at 1191 *(quoting Ashwander v. TVA*, 297 *U.S.* 288, 347 [56 *S.Ct.* 466, 80 *L.Ed.* 688] (1936)(Brandeis, J., concurring)). "Finally, facial challenges ... prevent[ ] laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*, 128 *S.Ct.* at 1191. In this latest round, Plaintiffs have not asserted a facial challenge and therefore no further discussion of the same is warranted.

Plaintiffs challenge the constitutionality of SFRA's funding formula "as-applied" to the Abbott districts. Whether a statute passes a constitutional challenge "as-applied" to any individual school district at any particular time must be determined only in the factual context presented and in the light of circumstances as they appear. *See Robinson v. Cahill*, 69 *N.J.* 449, 455 [355 *A.2d* 129] (1976).

"It is well recognized that legislative enactments enjoy a presumption of validity." *Abbott XIX, supra*, 196 *N.J.* at 550 [960 *A.2d* 360]. "Whenever a challenge is raised to the constitutionality of a statute, there is a strong presumption that the statute is constitutional." *State v. Muhammad*, 145 *N.J.* 23, 41 [678 *A.2d* 164] (1996). However, given the "unique procedural circumstances" presented and as the enactment of SFRA came "in the wake of the constraining circumstances of ... prior remedial orders directed at the State[,]" "SFRA's constitutionality, which otherwise would be presumptive, must be approached differently." *Abbott XIX, supra*, 196 *N.J.* at 551–52 [960 *A.2d* 360]. The Court's "existing decisions and orders ... must serve as the starting point for any discussion of the constitutionality of SFRA as applied to the pupils who are the beneficiaries of those rulings." *Id.* at 551 [960 *A.2d* 360].

The issues to be resolved in determining whether SFRA is constitutional "as-applied" are whether the State has overcome the

deficiencies found in CEIFA's funding provisions "as-applied" to Abbott districts; whether SFRA's formula sufficiently meets the special needs of disadvantaged students through its planned approach; whether it is reasonable to allow SFRA's approach to replace the open-ended, "individual-district-needs-based" approach that has evolved through the current method of supplemental-program funding; and whether the unique needs of Abbott students may be met, such that there can be a reasonable assurances these students will receive a "thorough and efficient education."

## B. *The Burden on the State*

The New Jersey Rules of Evidence set forth three potential standards for the burden of persuasion: (1) by a preponderance of the evidence, (2) by clear and convincing evidence, (3) or beyond a reasonable doubt. *See NJRE* 101(b)(1). The first two standards are applied in civil cases; "beyond a reasonable doubt" is usually reserved for criminal cases. *See Liberty Mut. Ins. Co. v. Land,* 186 *N.J.* 163, 169–70 [892 *A.*2d 1240] (2006).

In civil actions, generally, the preponderance standard applies. *Ibid.* This standard requires a litigant to establish a desired inference is more probable than not. *Ibid.* The preponderance standard is considered adequate when the claim being advanced is "not one, which is either unusually subject to deception or disfavored by the law." *State v. Sheppard,* 197 *N.J.Super.* 411, 440–41 [484 *A.*2d 1330] (Law Div.1984). "Application of the preponderance standard reflects a societal judgment that both parties should 'share the risk of error in roughly equal fashion.'" *Liberty Mut. Ins. Co., supra,* 186 *N.J.* at 169 [892 *A.*2d 1240] *(quoting Addington v. Texas,* 441 *U.S.* 418, 423 [99 *S.Ct.* 1804, 60 *L.Ed.*2d 323] (1979)). To apply any other standard, "expresses a preference for one side's interests." *Ibid. (quoting Herman & MacLean v. Huddleston,* 459 *U.S.* 375, 390 [103 *S.Ct.* 683, 74 *L.Ed.*2d 548] (1983)).

The clear and convincing standard, also applied in civil cases, requires a showing greater than a preponderance but less than

beyond a reasonable doubt. *Liberty Mut. Ins. Co., supra*, 186 *N.J.* at 169 [892 *A*.2d 1240]. For this standard, the trier of fact should have "a firm belief or conviction as to the truth of the allegations sought to be established." *Ibid. (quoting In re Purrazzella*, 134 *N.J.* 228, 240 [633 *A*.2d 507] (1993)). The clear and convincing standard is required "when the threatened loss resulting from civil proceedings is comparable to the consequences of a criminal proceeding in the sense that it takes away liberty or permanently deprives individuals of interests that are clearly fundamental or significant to personal welfare." *In re Polk License Revocation*, 90 *N.J.* at 560, 563 [449 *A*.2d 7] (1982). In addition, the clear and convincing standard is compelled where "proof by a lower standard will not generate confidence in the ultimate factual determination[,]" *id.* at 568 [449 *A*.2d 7], or where "the evidentiary matters are intrinsically complex or prone to abuse." *Liberty Mut. Ins. Co., supra*, 186 *N.J.* at 170 [892 *A*.2d 1240].

Here, there remains a dispute as to the appropriate standard of proof. Plaintiffs argue the clear and convincing standard should be applied, as fundamental constitutional entitlements are at stake, "convincing" is akin to "clear and convincing," and the Court's prior use of "convincing" indicates the Court intended a "clear and convincing" standard. Plaintiffs' Pre–Trial Brief at 27–30. The State argues the preponderance standard is the appropriate standard, as not all constitutional rights cases are entitled to the heightened standard, legislative acts are presumed constitutional, and the Court did not mandate a higher standard in its remand order. Defendant's Pre–Trial Brief 29–33.

The Supreme Court remand has not explicitly set forth the standard to employ in this remand proceeding, suggesting a simple preponderance standard is appropriate. Nonetheless, the Court directed prior Abbott decisions as a starting point for analysis. *See Abbott XIX, supra*, 196 *N.J.* at 551 [960 *A*.2d 360]. In addition, the Court specifically referenced the *Abbott IV* standard, summarizing the *Abbott IV* Court's decision as allowing "an

adequate alternative funding remedy **so long as the State could show, convincingly,** that a thorough and efficient education can be met through expenditures lower than parity...." *Id.* at 562 [960 *A.*2d 360] (emphasis added). Therefore, although the Supreme Court did not explicitly require a certain standard for this proceeding, with prudence, this court will employ a "convincing" standard for several reasons.

First, the presumptive standard is by a preponderance. A higher standard is employed only in limited circumstances; therefore, in determining the burden, the preponderance standard is the starting point. In *Abbott IV*, the Supreme Court used the term "convincing"; this is significant. The Court is well versed in evidence standards. As such, had the desired standard been clear and convincing, the Court would have so stated, tellingly the Court did not do so. A "convincing" standard requires a burden greater than the preponderance standard, yet does not necessitate the clear and convincing standard. The State must establish SFRA is constitutional by a standard higher than a simple probability but lower than a high probability. Suffice it to say, the court must simply be convinced SFRA provides the funding needed for a thorough and efficient education.

This court has reviewed the hundreds of documents in evidence, listened to weeks of testimony, and heard the various arguments of counsel regarding the validity of SFRA. In sum, this court is convinced SFRA was designed to exceed the requirements necessary to provide a thorough and efficient education such that the interim parity remedy no longer need be employed. Nonetheless, this court does not have the prescience to decide currently how SFRA funding will work in practice; therefore, supplemental funding shall be recommended as set forth below.

## X. *Analysis—Generally*

SFRA represented a methodical attempt to identify and determine the resources needed for all students in the State of New Jersey to achieve the CCCS. It did so by using the Weighted

Student Formula with appropriate weights attributable to the upper school level grades, at-risk, LEP, and special education students. Separate consideration was afforded to delivering high quality pre-school to a far broader range of students than offered previously. SFRA represented the culmination of in excess of five years of deliberate, good faith efforts by the State to serve the needs of all students, and importantly, those students schooled in the Abbott districts. The development began with the PJP process beginning in or about 2002 and culminating with the RCE issued on December 12th, 2006. At or about the same time the Joint Legislative Committee on Public School Funding Reform (the "Joint Committee") issued its final report and recommendation. Six public hearings were thereafter scheduled and conducted inviting members of the public to comment on the RCE. An opportunity for citizens and various public advocacy groups to be heard was provided. The DOE, with APA's assistance, updated the cost figures and the updated calculations were published on January 19th, 2007. At or about the same time, the DOE retained three nationally renowned experts in the field of school finance—Allen Odden (University of Wisconsin), Lawrence Picus (University of Southern California), and Joseph Olchefske (American Institutes For Research), to review and comment on the findings and methodologies referenced in the RCE. Odden synthesized the reports of his colleagues and issued his report on January 19th, 2007 denominated, the Final Report on the Reviews of the Report on the Cost of Education in New Jersey (the "Final Expert Report"). Fundamentally, the Final Expert Report found the resources as set forth in the RCE were more than adequate, but certain recommended adjustments were made. After the public hearings were concluded and the Final Expert Report was received by the DOE, it then, again, invited three nationally renowned experts: Thomas Corcoran (Columbia University), Susanna Loeb (Stanford University), and David Monk (Pennsylvania State University), to form an Advisory Panel (the "Advisory Panel") to assist in the development of the new funding formula.

Additional public meetings were held between April and December 2007. Utilizing public comments, the Final Expert Report, and the suggestions of the Advisory Panel, changes were made and the Formula For Success was issued on December 18th, 2007. D–12. The FFS is the foundation of SFRA. It reflected the numerous changes and "enhancements" to the resources that had been set forth in the RCE. D–2. The DOE posits, as enacted, the funding formula adopted by SFRA provides more than sufficient money for a thorough and efficient education for the students within the Abbott districts, inclusive of the supplemental programs as mandated in *Abbott V* and *X*.

This intricate and prolonged process reflects the DOE's and the State's meaningful efforts to initiate a uniform spending formula, in lieu of the two-tiered formula, for the students in New Jersey. That is, under SFRA there will no longer be a separate status or formula that applies only to the students in the Abbott districts. The State's laudable goal was to create a transparent, equitable, and predictable funding formula for all its students. It is noted the interests of students in all districts other than the Abbott districts are not concretely before the court.

> We cannot give an advisory opinion on SFRA's statewide constitutionality. The *Abbott v. Burke* litigation does not provide this Court with jurisdiction to address the statute's applicability to students not before the Court.

*Abbott IX, supra,* 196 *N.J.* at 551 [960 *A.*2d 360].

It is, though, noteworthy that no amicus before this court sought to represent the vast majority of school children in New Jersey. The restriction that befell the Supreme Court is equally applicable here. As such, the court's focus must be solely upon the constitutionality of SFRA as it applies to the students in the Abbott districts. That said, to intelligently analyze and review SFRA, the court is compelled to also observe the full panoply of rights and expectations of all our students.

Abbott districts were created based upon certain identified factors for districts that were urban. Districts with all the necessary factors, but which were not urban, were not so classi-

fied. As such, under the current system, students in various DFG A or B districts may be deprived and may have been deprived of many of the benefits afforded to the Abbott district children solely premised on the district not being sufficiently "urban." The need to address this inequity is obvious. SFRA is then the attempt to ensure all disadvantaged students, regardless of where they live or how their district is categorized, will receive the necessary educational resources to help these students achieve the CCCS. When forty-nine percent of the in excess of 375,000 at-risk students in 2008 attended schools in non-Abbott districts; when approximately 473,000 minority (Hispanic and African American) students attended public schools and fifty-four percent did so in non-Abbott districts, and when high quality pre-school was only mandated for the Abbott districts (see generally D-1), the State's goal to create a uniform system becomes clear. Analysis of financial information further substantiates the need for reform. Total state aid to the Abbott districts 2008–2009 is $4.65 billion. Of the $8.429 billion in total State aid, fifty-five percent of the same is allocated to the Abbott districts which enroll twenty-three percent of our students statewide. D-20 ¶ 23. The percentage of enrollment of students in K-12 indicates one-fifth of the students were educated in Abbott districts; four-fifths in non-Abbott districts. D-115. When considering enrollment from preK-12 in 2009 twenty-three percent of the students are educated in Abbott districts; seventy-seven percent in non-Abbott districts. D-114. Despite the same, Abbott districts receive the majority of state aid for education. If the Abbott districts do not increase tax levies beyond compliance with the required minimum tax levy, Abbott districts will have available an average of $17,151 in revenues per pupil for the 2008–2009 school year. Assuming the I and J districts raise their tax levies for the 2008–2009 year by four percent (consistent with the local levy growth limitation of N.J.S.A. 18A:7F–38), they will spend an average of $14,117 per pupil. D-20 ¶ 24.

The time for reform is now.

## XI *Supplemental Programs*

Supplemental programs in the Abbott districts are those "supplemental educational and educationally-related programs and services that are unique to [students in Abbott districts], not required in wealthier districts, and that represent an educational cost not included within the amounts expended for regular education." *Abbott IV, supra,* 149 *N.J.* at 180 [693 *A.2d* 417] (*quoting Abbott III, supra,* 136 *N.J.* at 453–54 [643 *A.2d* 575] ).

"Supplemental programs and services" were defined in *N.J.A.C.* 6A:10–1.2 as follows:

Those programs and services not already required by State or Federal law, but that are supported by school and school district needs ·assessment of resources required to improve instructional performance, which may include programs and services on the *Abbott X* Chart of Supplemental Programs.

In *Abbott V* the Court, by its author, Justice Handler, reviewed "the remedial measures that must be implemented in order to ensure that public school children from the poorest urban communities receive the educational entitlements that the Constitution guarantees them." *Abbott V, supra,* 153 *N.J.* at 489 [710 *A.2d* 450]. The Court stressed the importance of having the "particularized needs" of the students in the Abbott districts drive the determination of what supplemental programs should be developed. *Id.* at 511 [710 *A.2d* 450]. The Commissioner was authorized to implement supplemental programs at the request of individual schools or districts dependent upon existing needs and the Court required adequate funding of such programs necessary for the achievement of a thorough and efficient education.

The Court re-examined the issue of supplemental programs in *Abbott X.* In that matter, the same parties that are before the court today requested the Court direct the improvements to implementation of whole school reform and supplemental programs as agreed to in the Court ordered mediation. *Abbott X, supra,* 177 *N.J.* at 584 [832 *A.2d* 891]. By way of the Court's order it set forth in paragraph 4, Supplemental Programs:

a. Every *Abbott* school shall continue to implement supplemental programs as set forth in the chart entitled 'Supplemental Programs in Abbott Schools,' attached hereto. Although the DOE has not agreed that all the programs listed on the chart are supplemental or are required by *Abbott V*, the department has agreed to the inclusion of the contents of the chart in regulations to be adopted;

b. Regulations shall be developed to guide school and district assessment, planning and implementation of needs-driven supplemental programs as set forth in the chart entitled "Supplemental Programs in Abbott Schools."

*Id.* at 587 [832 *A.*2d 891].

As noted, a chart concerning Supplemental Programs in Abbott Schools was appended as an appendix. The following was set forth:

In *Abbott V*, the Supreme Court directed implementation of supplemental programs and services in Abbott schools. In some program areas the Court established a "baseline" as the minimum requirement. In others, the programs are required without a baseline, but the design of the program must be based on need. In still others, the program is not required, but must be implemented and designed as needed.

In all program areas, the Court "stressed the importance of having the particularized needs of these children drive the determination of what programs should be developed," concluding that the "provision of supplemental programs involving necessary services should not be detached from the actual needs of individual Abbott schools and districts."

The determination of need must guide school and district plans and budgets in all program areas. Thus, where the Court established a baseline, schools must either provide the baseline or, **depending on need, adjust it to provide none, less or more than the baseline,** or an alternate design.

*Id.* at 590 [832 *A.*2d 891] (emphasis added).

The chart was broken down into three areas of supplemental programs:

1. Required program areas with baseline;
2. Required program areas with no baseline; and
3. If needed program areas.

The only "options" listed as mandatory in the first sub-section listed above were full-day kindergarten and class size limits.

Plaintiffs urge the "at-risk costs" set forth in the SFRA are not sufficient to address the unique disadvantages of the Abbott students and do not include the necessary resources for the needed supplemental programs. *See, e.g., Belfield,* 15 T 62:10–66:14; P–19 ¶ 41. They assert SFRA should be deemed unconsti-

tutional as applied as it fails to require Abbott districts to implement the *Abbott V* and *Abbott X* supplemental programs, particularly as there is no differentiated funding concerning the same. Further, plaintiffs assert there is no assurance the necessary funding will be directed to the special needs and disadvantages of Abbott students, but rather, the necessary funds may be taken from the general budget thereby depriving the students of these necessary programs.

Defendants counter it is particular needs that guide supplemental programs, the chart appended to *Abbott X* is not a "rigid prescription" of supplemental programs that must be provided to the students in the Abbott districts, State's Post–Trial Brief at 15 ¶ 44, and lastly assert there are more than ample funds provided to the Abbott districts to provide whatever supplemental programs are needed.

This court is satisfied the defendants' position is the prefered one. Belfield admitted per pupil costs if all supplemental programs were deemed necessary would be over $33,000 for each middle and high school student, and $31,000 for each elementary school student. Belfield, 16 T 23:20–24:6. Belfield conceded he did not compute the applicable costs for all supplemental students who are at-risk in New Jersey, nor how much the same would increase the education budget. *Id.* at 24:7–12. In its rebuttal case the defense presented Atwood. She testified the costs to support or fund the supplemental programs as urged by Belfield would be, approximately, an additional $2.9 billion. Atwood, 29 T 127:5–128:3. To continue to require separate funding of supplemental programs is antithetical to the goal of a unified funding scheme as enacted in SFRA, particularly when the State has demonstrated there should be adequate funds for all necessary programs in all districts, including the Abbott districts.

## XII *Supplemental Funding*

One of the pivotal disputes during the course of the trial was whether the provision for supplemental funding for Abbott dis-

tricts should continue. This issue was broached with counsel in the court's initial comments immediately prior to the start of the trial. 1 T 6:14–25. Understandably, the positions of the parties are diametrically opposed. Plaintiffs assert if the court is to consider SFRA constitutional it is imperative supplemental funding remain available to the Abbott districts as a "safety net." The State contends permitting supplemental funding to continue under SFRA is an anathema to the formula developed and eviscerates the goal of a uniform funding system with the requisite needed discipline.

*N.J.A.C.* 6A:10–1.1 provides as follows:

These rules are adopted to implement the *Abbott v. Burke* decisions and are promulgated pursuant to the May 9th, 2006 New Jersey Supreme Court Order (187 *N.J.* 191 [901 A.2d 299]) to ensure that budgets are prepared and approved in a manner that ensures all students in poor urban school districts receive the educational opportunities and resources guaranteed them by the New Jersey Constitution. The rules apply to "Abbott districts" as defined in *Abbott v. Burke*, 119 *N.J.* 287 [575 A.2d 359] (1990, *Abbott II*) and *N.J.A.C.* 6A:10–1.2, and are adopted to ensure the provision of adequate funding to ensure a thorough and efficient system of education as guaranteed by the New Jersey Constitution (T & E), and defined by the Supreme Court in the Abbott decisions and by P.L. 1996, c. 136, as the Core Curriculum Content Standards.

Supplemental funding, which has been restricted solely to the Abbott districts, allowed those districts to make application for "supplemental" or additional monies beyond those set forth in the districts' budget requests which were to be submitted on or before February 1st. *N.J.A.C.* 6A:10–2.4, 2.5. The application for additional funds was controlled by *N.J.A.C.* 6A:10–2.8 and addressed funding that could not be included in the standard budget application. The separate application solely addressed the request for supplemental or additional funds. Requirements for what needed to be provided were set forth in *N.J.A.C.* 6A:10–2.8(b). Although the requirements set forth are mandatory, and may be considered onerous, practice has suggested exacting compliance with the rules has been absent. The same is not to suggest a laxity or a lack of compelling effort but, rather, the inherent problems in applications for supplemental funding which required, to be properly analyzed,

a full and exacting review of the complete budget in an effort to determine whether all monies approved were needed to ensure a thorough and efficient education to meet the CCCS standards. *N.J.A.C.* 6A:10–2.1.

It is, again, important to note supplemental funding was only available to the Abbott districts. Defendants urge, somewhat urgently, it has been abused historically as a means to increase spending, to avoid needed fiscal discipline, and as a disincentive to determine and eliminate inefficiencies. The State suggests the program has allowed Abbott districts to appreciate they need not operate within defined limits and the program has historically been used as a "budget filler" used to address "shortfalls" rather than to implement innovative programs as structured. The State urges supplemental funding requests are often "grossly inflated." As such, SFRA was formulated to eliminate supplemental funding premised upon the theory the formula was constructed so that more than adequate resources would be available to the Abbott districts to meet the requirements for a thorough and efficient education. This is particularly so when it is considered SFRA was constructed without consideration of receipt of federal funds which are used to supplement, rather than supplant State aid.[33] Although the State agrees this court cannot consider federal aid when evaluating the constitutionality of SFRA, it urges the court it should and can consider federal aid as it addresses the question of supplemental funding.

The Abbott districts received a total of in excess of $150 million in federal Title I funding in the fiscal year 2008–2009. D–131. The Abbott districts have also received, and will continue to receive,

---

[33] *Abbott II, supra,* 119 *N.J.* at 331–32, 575 *A.2d* 359, established reliance upon federal aid cannot satisfy the State's obligation to provide a thorough and efficient education. As such, this court indicated it could not consider the same when evaluating the constitutionality of SFRA. Although the State agreed this court is so limited, it reserved the right to suggest federal aid can and should be considered by the Supreme Court when evaluating the constitutionality of SFRA.

federal "IDEA funding." Atwood, 29 T 100:24–110:15; D–132. The total amount of IDEA funding the Abbott districts received in the fiscal year 2008–2009 was in excess of $74 million. D–132. In addition, the Federal American Recovery & Reinvestment Act of 2009 ("ARRA"), the federal "Stimulus Package," will provide additional funds to the Abbott districts in the form of increased Title I and IDEA funding. Atwood, 29 T 100:24–110:15; D–131; D–132. Under current estimates, the Abbott districts will receive in the fiscal year 2009–2010 an additional approximately $66 million in Title I funds, and an additional $48 million in IDEA funds under the Stimulus Package. D–131; D–132. These amounts are in addition to the Title I and IDEA funds the Abbott districts would otherwise receive. As such, the total amount of federal funding available to the Abbott districts under Title I and the IDEA, including the estimated augmentation under the Stimulus Package, is approximately $339 million. D–131; D–132. These monies cannot be blithely ignored.

The State urges the current process for supplemental funding in the Abbott districts is "labor intensive" and puts a considerable strain upon the DOE to timely and comprehensively consider the requests for supplemental funding. The State suggests there is often insufficient time to review applications even if the necessary information is timely provided, which it is often not, in light of the May 31st yearly deadline. Further, to properly review the request necessarily implicates a complete review of a district's budget application and approvals. Given the time constraints the State urges it is often compelled to engage in a negotiation process. Further, the wish to avoid contentious litigation often leads to an award of monies which are not necessary for a thorough and efficient education but, rather, simply reflects the recognition of existing constraints and circumstances.

The plaintiffs urge this position need be reviewed in light of the rules and regulations as promulgated by the DOE. *N.J.A.C.* 6A:10–1.1 to –3.8. The rules set forth supplemental funding is to be used for a specific purpose, whether it relates to programs,

positions or services, *N.J.A.C.* 6A:10–2.8(a), and the rules are quite specific as it concerns the detailed narrative districts are compelled to provide in their application for additional funding. *N.J.A.C.* 6A:10–2.8(b)1–7. Plaintiff urges the history of prior approvals does not reflect an adversarial relationship as urged by the State and, further, should serve as evidence the DOE has historically found the monies for the supplemental programs were needed for a thorough and efficient education. *See N.J.A.C.* 6A:10–1.1(a). Although facially correct, such an argument is rejected as facile. The realities demonstrate, despite the language of the rules, funding is often provided for reasons other than to meet the CCCS. *See, e.g.*, D–161. That said, the Commissioner was compelled to agree the DOE had the authority to reject a request if not properly filed or if it was submitted without sufficient information. Further, if the monies were not spent as specified the DOE could seek return of the same. Again, although technically correct, the same does not reflect the realities that exist.

While recognizing the defendants' arguments concerning supplemental funding are not without appeal, this court is satisfied, given the burden imposed, it cannot find SFRA constitutional as applied if supplemental funding is not recognized, if only for the first three year review period. The potential harm to the students in the Abbott districts outweighs the defendants' assertion there shall be no need for supplemental funding, at least until the realities of implementation are known. This is particularly so when it is recognized in years two and three of SFRA's implementation there is no increase in aid to the Abbott districts and at the same time municipal overburden is not expected to significantly improve. The same also recognizes during this same period certain increased costs will exist which may be beyond the district's ability to control, such as increases in utility bills, insurance premiums, teachers' salaries, etc. Further, there are certain concerns as it relates to the cap imposed for the at-risk population at sixty percent. Recognizing there are no studies which establish conclusively costs will not escalate when concentrations of poverty

exceed sixty percent, and twenty-four of the thirty-one Abbott districts have such poverty concentration, concerns arise. *See* D-12. The State's theory during these periods inefficiencies will be identified may be correct, but has not been demonstrated sufficiently to allow the court to accept the same, again, given the burden imposed upon the State.

During the trial the court requested the defense, particularly Davy and Atwood, propose various protocol as it relates to supplemental funding, without prejudice to the State's position the court should not consider the same. Both refused the court's invitation. This position, while understandable, was and is disappointing as it deprived the court of the State's position as to how to implement appropriate protocol. Atwood testified the rules and regulations as it relates to supplemental funding have been "evolving" and "improving." Atwood, 29 T 45:19–48:25. The court can discern no reason why the same should not continue. As such, this court recommends to the Court the Commissioner be obligated to promulgate new rules and regulations concerning applications for supplemental funding which should address timeliness of submissions, documents and information necessary, proper protocol for review and determinations, and a consideration whether the Commissioner's decisions concerning supplemental funding should be detailed and published for the guidance of the other districts. Further, the court or the Commissioner may wish to consider preschool guidance and protocol as a model for any revised protocol given the successes achieved in that field.

Although appreciative of the commendable and considerable efforts made by the State in the enactment of the new funding formula, this court is not satisfied elimination of this provision adequately serves the needs of the Abbott district students, at least during the transitional period when empirical evidence can be established. At that point, funding will have made the transition from anticipation to reality and analysis can be empirically based.

## XIII *Conclusion*

The constitutional imperative for a thorough and efficient education is clear. How to ensure the same has proven to be challenging. SFRA represents the most recent and most thoughtful attempt at the implementation of a new comprehensive educational funding program. There can be no guarantees assuring the success of any program, and certainly not one in the educational arena. That said, SFRA is the product of years of work by talented educators, reviewed and reviewed again, in an effort to attempt to ensure all students in New Jersey receive a thorough and efficient education. It represents a thoughtful, progressive attempt to assist at-risk children throughout the State of New Jersey, and not only those who by happenstance reside in Abbott districts.

Our President has spoken eloquently, as have many other leading figures in the political and educational fields, that money alone cannot assure the educational needs of our children.

Money, in and by itself, is no guarantee of educational success. Parental involvement, community concern and activism, abilities of teachers and support staff, forward thinking administrators, and students willing and hoping to learn, are all necessary components in obtaining educational success.

SFRA is an acceptable structure in an attempt to secure the thorough and efficient education so desperately needed for the development of our youth. As Dean Monk so aptly noted, "there is no perfect solution to [the] very complicated issues of school funding." D–123 ¶ 24. SFRA represents our best hope.

The recommendations espoused herein are submitted for the Court's consideration.